**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Webster WILLIAMS,
Defendant-Appellant.**

No. 79–1580.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 14, 1980.

Decided Aug. 28, 1980.

John W. Keker, San Francisco, Cal., for defendant-appellant.

Joseph M. Burton, San Francisco, Cal., for plaintiff-appellee.

Before DUNIWAY and HUG, Circuit Judges, and CROCKER,[*] District Judge.

DUNIWAY, Circuit Judge:

Webster Williams appeals from a judgment of conviction of the robbery of a branch of California Savings and Loan Association in Fremont, California (the Association) in violation of 18 U.S.C. § 2113(a). We affirm.

## I. The Facts.

Williams does not argue that the evidence does not support the conviction. We therefore state the facts only briefly. Additional facts will be stated as we consider the points argued by Williams' counsel on this appeal.

In mid-afternoon on November 20, 1978, two employees were alone in the office of the Association—Diane Dunn, an assistant manager, and Monica Scott, a teller. Two people, later identified by the bank employees as Donna Dyer, a black woman, and Williams, a black man, entered the office. The woman discussed opening a savings account with Scott, while the man went upstairs, where he surprised Dunn. Grabbing Dunn's arm, he lifted his coat revealing what appeared to be a bomb. He forced her downstairs where he announced that a robbery was taking place. He then began stuffing money into a tan purse carried by the woman. The two robbers were in the bank for approximately 20 minutes. Finally they locked Dunn and Scott in the vault and fled.

## II. Denial of Motion to Strike Dyer's Testimony.

Williams and Dyer were charged with the robbery in the same indictment. Dyer pled guilty to the charge, was sentenced to two years, and became one of the chief prosecution witnesses at Williams' trial. She was the government's first witness. On direct examination, she told the following story.

She had known a man named Jesse Clark since 1968, and had been living with him since June, 1978. She had known Williams for about a month before the robbery. Clark introduced her to Williams, who drove a green and white Lincoln car.

At about 8:30 on the morning of November 20, 1978, she and Clark "was copping some drugs." Williams talked to them about "doing a bank," and said he needed a driver. He and Clark "was going to do the job" and Williams offered her a thousand dollars if she would drive the car from the scene of the bank. She agreed, and Williams left.

He came back at about 10:30. The three were in Dyer's house, and the two men asked her to leave the room, which she did, going to the kitchen. She heard some of their conversation, Williams asking Clark the best area to which to go. When she returned to the room, Clark said that she and Williams were to enter the bank, because it "would look better with a man and a woman than two males." The money was to be split, half to her and Clark and half to Williams. Williams was wearing blue slacks, blue shirt, and "like" a black leather coat. Clark wore brown pants and a gold shirt. Clark said they would go to Fremont. They were to take two cars. He also told her to take her purse—a brown leather shoulder bag. Williams said he would not take a gun; "he was to use flares." He had a gun and the flares. He had "taped them up to where they looked like dynamite." She saw him do that, and paint them black and run some wires

* The Honorable M. D. Crocker, United States District Judge for the Eastern District of California, sitting by designation.

through them and connect them up. However, it was Clark who brought the flares to the house. Williams took the gun out to his car.

The three then left the house. Clark had a blue Chevrolet Nova car. Williams was in his car and she and Clark were in the Nova. They went to Fremont, where Williams parked his car and got in the Nova with her and Clark. They rode around, looking at different banks. Finally, Williams showed Clark the Association and said "that's the one." Then Williams went to his car, drove it to a point about three blocks from the Association, and parked it. Clark and Dyer followed in the Nova. Williams joined them, and they drove in the Nova to the Association. Williams got a "tan-brown leisure suit, two-piece," from Clark and put it on over his clothes in the back seat of the Nova. Williams and Dyer left the Nova, Williams told her to talk to the teller, and they entered the Association.

After describing the actual robbery, Dyer said that she left the Association, followed by Williams. They got into the Nova and drove to Williams' car. During that drive, Williams took off the suit. Williams then got in his car by himself, and she and Clark, in the Nova, were followed by Williams in his car. After going two blocks, Clark and Dyer left the Nova and got in Williams' car. He took her purse, with the money in it, and put the flares in it. Williams then pulled into a small shopping area, and he and Clark got out, leaving her in the car. At that point she was arrested, as was Williams. Clark was not caught.

On cross-examination, Dyer testified that her occupation was "clerk-typist," but that she had not worked at it since April of '78. After that, she worked at "some other profession, prostitution," and had a "sprinkling" of arrests for it. She was a prostitute because she and Clark had a drug habit which in November, 1978, was costing them "from I'd say, $150 to $200 a day," for cocaine and heroin. She was getting the money from soliciting and stealing. Asked whether it was also from robbing, she denied that she was robbing, and said of Clark, "Oh yes, he was robbing."

She was then asked, "Did you, either alone or in participation with other people, commit burglaries?" Her counsel objected on the basis of her "fifth amendment privilege." The court sustained the objection. There was no objection by Williams' counsel, who proceeded to question her about her felony convictions—bank robbery in this case, and burglary in a state case in May, 1979, on a charge pending when she was arrested in this case.

She was next asked about her plea bargain and agreement to testify against Williams. Having testified that part of the plea bargain was that she would testify "truthfully" and would testify that she and Williams did commit the robbery, she testified further about her relations with Clark. They had been economically dependent on each other for at least the past few months, heroin addicts together and raising money for their collective efforts to get heroin and cocaine; Clark's car was the getaway car; Clark bought the flares and the tape, but Williams, not Clark, taped the flares. She described the differences in appearance between Clark and Williams, and said that Clark owned the leisure suit that Williams wore during the robbery.

She was then asked where the Nova car came from, whether Clark owned it, whether the Nova was a stolen car, whether she alone, or with someone else, stole it, whether Clark stole it. To all of these questions, objections by her counsel on the ground of fifth amendment privilege were sustained. Williams' counsel then proceeded to another question. Thereupon the trial adjourned for the day and the jury was excused. There was a question raised by Williams' counsel, after the jury left, about another matter, but nothing was said about the court's sustaining of Dyer's claim of privilege.

The next morning, Dyer was asked whether she told the FBI that the Nova was a stolen car. An objection, on the ground of fifth amendment privilege, was sustained. At that point, for the first time, Williams' counsel moved to strike all of

Dyer's testimony "on the ground that she cannot be, by invoking these privileges, can't be properly cross-examined in this case." The court said that it would hear argument outside of the presence of the jury, and counsel said "I will bring it up again, then."

Dyer then testified that she did not tell the. FBI that the leisure suit belonged to Clark, and that she did not recall whether she told the FBI that Clark bought the flares and the tape. She said she was not covering up for Clark. She knew, when she talked to the FBI, that Clark was facing criminal charges. She said that, at the time of trial, Clark was in California state prison. She said that she and Clark had no plan about leaving the Nova in Fremont or bringing it back, that she never had possession of the "bomb," never touched it, and that it was not in the Nova when she and Clark drove to Fremont, that Williams had it.

At the close of the morning session on July 17, Williams' counsel sought to argue his motion to strike Dyer's testimony, but the court said "We will argue it at some later time . . . but not now . . . bring it up later . . . ." Counsel never did so. Counsel never attempted to make any offer of proof. The most that he can point to is his opening statement, in which he suggested that the man who robbed the bank with Dyer was not Williams, but Clark, and that Dyer was testifying against Williams to save Clark. Most of the facts that counsel mentioned as supporting his theory—that Dyer and Clark lived together, that they were addicts, that they had committed other crimes, that the three went to Fremont in two cars, were testified to by Dyer. Williams did not take the stand, apparently because he had an embarrassing criminal record.

■ Confining ourselves to the facts of this case, we conclude that it was not reversible error to deny the motion to strike Dyer's testimony. Because Williams' counsel made no offer of proof, propounded no other questions in lieu of an offer of proof, and made no argument in support of his motion to strike, we confine ourselves to the effect of his inability to get answers to the questions actually put.

The first was, did Dyer, alone or with others, commit burglaries? This did not mention Clark, and a "yes" answer, while damaging to Dyer, would not implicate Clark. Dyer had already testified that Clark "was robbing." An answer would have added nothing to that testimony, and we will not speculate as to what the next question might have been.

The remaining questions all dealt with the ownership of the Nova, who owned it, was it stolen, did Dyer steal it, did Clark, did she tell the FBI it was stolen? She had already testified that Clark furnished the Nova. Assuming that, if ordered to answer, she would have said that Clark had stolen it, that would have added little to the defense.

The defense theory was that Clark, not Williams, was the male robber, and that Dyer was covering up for him. If so, she was doing it in a most peculiar way. Her testimony summarized above, far from protecting Clark, would clearly support a finding that he was a principal in the commission of the crime. 18 U.S.C. § 2. It has him helping to plan the robbery, supplying the car, supplying the flares and tape and helping to construct the "bomb," furnishing the clothes to Williams, transporting the robbers to and from the Association, and expecting to share half of the loot. We cannot conceive that an intelligent juror would have been persuaded to find Williams not guilty if Dyer had said that she had committed burglaries (the jury knew that she had been convicted of one) and that she and Clark, or Clark alone, or someone else, had stolen the Nova (the jury already had been told that Clark had furnished the car). What difference would it have made if the car was stolen by Clark or by anyone else?

The Sixth Amendment to the Constitution protects the right of a defendant in a criminal case to confront and cross-examine his accusers. *Smith v. Illinois*, 1968, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956. The Court has held, in *Davis v. Alaska*, 1974, 415

U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347, that refusal to permit cross-examination of a witness as to his conviction of a felony, for the purpose of impeachment, is "error of the first magnitude, and no amount of showing of want of prejudice would cure it," 415 U.S. at 318, 94 S.Ct. at 1111, citing *Smith v. Illinois, supra,* which quotes a dictum in *Brookhart v. Janis,* 1966, 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314.

*Davis* is the case upon which Williams particularly relies. However, Williams did show, on cross-examination that Dyer had been convicted of two felonies, robbery in this case and burglary in another case. In *Davis,* the Court recognized that the court would have a duty to protect a witness from "an attempted invasion of his constitutional protection from self incrimination, properly invoked," as well as from "questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him," 415 U.S. at 320, 94 S.Ct. at 1112, quoting from *Alford v. United States,* 1931, 282 U.S. 687, at 694, 51 S.Ct. 218, at 220, 75 L.Ed. 624.

It is at least doubtful whether the questions in response to which Dyer asserted her privilege called for admissible evidence. Rule 404(b), F.R.Ev. At the most, the answers would show possible bias in favor of Clark and against Williams. But counsel already had considerable evidence of such bias, so that the answers sought would be merely cumulative. The power of a judge to limit merely cumulative or repetitious cross-examination cannot be doubted. As to the Nova, its ownership, as distinguished from the use made of it, is only peripherally relevant, if at all.

We conclude that the curtailed cross-examination related to merely collateral matters. As the Second Circuit said in *United States v. Cardillo,* 2 Cir., 1963, 316 F.2d 606, 611:

> Where the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him.

*United States v. Norman,* 9 Cir., 1968, 402 F.2d 73, is closely in point. There, the principal witness against a defendant charged with selling narcotics invoked his privilege against self-incrimination when asked whether he had made other purchases of narcotics, whether he had access to sources of heroin other than the defendant, or had had possession of heroin other than that bought from the defendant. The trial judge sustained the claim of privilege. Trial counsel did not claim that it was error to do so, and did not move to strike the testimony of the witness. We said that counsel had two purposes in asking the questions. One was to undermine the witness' credibility. As to this, we cited and followed *Cardillo, supra* (402 F.2d at 77). The second purpose was to show a source of the narcotics other than the defendant. In response, we pointed out that the witness had been searched and then watched when he went to the defendant to make a buy, so that the answers "would not have undermined the government's case." (*id.*). We concluded that there was no "plain error." (F.R. Crim.P. 52(b)).

Here, counsel did move to strike, so that we are concerned with "error," and not "plain error." There is, however, another rule dealing with error, Rule 52(a). We doubt that there was error at all. But if there was, we find it harmless, in that it did "not affect substantial rights" of Williams in this particular case. Answers to the questions "would not have undermined the government's case." Moreover, if it can be said that the error, if any, is of constitutional dimension, a proposition about which we have much more doubt in this particular case, we are satisfied that the "error" was harmless beyond a reasonable doubt, for the reasons that we have stated. *Cf. Chapman v. California,* 1967, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705.

### III. *Validity of Identifications.*

#### A. *The Parking Lot Show-up.*

■ Approximately fifteen minutes after the robbery, the two Association employees, Dunn and Scott, were taken by police to the parking lot to view two "possible suspects." It was raining and Dunn and Scott were

not separated for the identifications. Dyer, who, being petite, was easily identifiable, was removed from the patrol car first and identified. Williams was removed next and identified. Dunn said "Yes, that's him except that he has . . . changed clothes." "He had on dark pants and just the dark T-shirt. He no longer had on the cocoa-brown pants or the cocoa-brown jacket."

Williams argues that this was an unnecessarily suggestive and unreliable identification. However, it is a permissible means of identification, see *United States v. Coades*, 9 Cir., 1977, 549 F.2d 1303, 1305. Here, the witnesses had about twenty minutes in which to view the undisguised male robber at close quarters. The time between the crime and the identification was short. The witnesses testified with a high level of certainty. The reliability of the show-up was supported by substantial evidence and it was properly admitted. *See Manson v. Brathwaite*, 1977, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140; *cf. United States v. Field*, 9 Cir., 1980, 625 F.2d 862, 865–68; *Green v. Loggins,* 9 Cir., 1980, 614 F.2d 219.

B. *The In-Court Identification.*

Williams claims that his identification in court, by the same two witnesses, was tainted by the show-up. But the show-up was not tainted, and so did not taint the identifications in court.

IV. *Search of the Car and Purse.*

Williams moved to suppress evidence found in his car at the time of his arrest. The motion was denied, and he assigns error.

Officer Whitemeyer, who arrested Dyer, approached Williams' Lincoln and peered in. He saw Dyer, fitting the broadcast description that he had heard of the female robber, crouched under the dashboard with her back to the fire-wall, facing the rear of the car. He drew his gun, ordered her out of the car, and arrested her. Having also heard that a bomb had been used in the robbery, he pulled Dyer's purse, which had been next to her on the car floor, onto the seat, and opened it. Inside, he saw the "bomb" and currency. He closed the purse and called for help. Soares, a technical unit officer, came, took the purse out on a long pole, and put it in a field. Then the Alameda Sheriff's Bomb Squad was called to examine the bomb.

After the car was impounded, Soares took out the jacket resembling the one that Williams wore during the robbery. In it he found a gun, a Smith & Wesson automatic pistol, model 59.

 Whitemeyer's knowledge of the robbery and of the description of the robbers, plus the facts just stated, gave him probable cause to believe that Dyer was one of the robbers. It was therefore proper for him to remove her from the car and arrest her. *See Pennsylvania v. Mimms*, 1977, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331. The fact that a bomb was reportedly used in the robbery and might still be in the car is an exigent circumstance sufficient to justify an immediate search of the car and the purse. *See United States v. Moreno*, 9 Cir., 1978, 569 F.2d 1049, 1052.

 Because probable cause existed to search the car, the admission of the jacket was proper under the vehicle exception to the Fourth Amendment as well as under the plain view exception. *Chambers v. Maroney*, 1970, 399 U.S. 42, 52 and n.10, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419. The police could have searched the jacket at the place of arrest; they could also search it after the car had been impounded, *Chambers v. Maroney, supra.* The discovery of the gun was lawful.

 Williams also objects to introduction of the gun under F.R.Evid. 403, claiming that its prejudicial effect outweighed its probative value. The gun was probative on the intimidation element of the robbery; however, it was merely cumulative in view of the evidence of the bomb. In addition, it corroborates Dyer's testimony that Williams had the gun and put it in his car. Williams' objection essentially concedes that the gun could add little to the jury's deliberation with regard to the substantive

elements of the crime charged. The trial judge gave a cautionary instruction as to its weight immediately after its introduction. There was no error.

### V. *Supplemental Instruction.*

After eight hours of deliberation, the jury notified the trial judge that it was unable to reach a verdict. With counsel present, the court rephrased part of its prior instructions. The jury returned a verdict of guilty within an hour. Williams challenges the charge given. We find that the charge was not, as Williams argues, a modified *Allen* charge, *Allen v. United States,* 1896, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528, but was merely a restatement of prior instructions to the jury as to the way in which they ought to deliberate, and that it had no coercive effect. *United States v. Beattie,* 9 Cir., 1980, 613 F.2d 762; *United States v. Seawell,* 9 Cir., 1978, 583 F.2d 416. *Cf.* Devitt & Blackmar, Federal Jury Practice and Instructions, § 18.15 at 610 (3d ed., 1977). The return of a verdict within one hour does not strongly indicate coercion.

Affirmed.