UNITED STATES of America,
Plaintiff-Appellant,

v.

Donald Gene BOOTH,
Defendant-Appellee.

Nos. 80–1613, 80–1783.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 15, 1981.

Decided Nov. 27, 1981.

Rehearing Denied Feb. 8, 1982.

Charles H. Turner, U. S. Atty., Portland, Or., for plaintiff-appellant.

Stephen F. Crew, Portland, Or., for defendant-appellee.

Before WALLACE and TANG, Circuit Judges, and PALMIERI,* District Judge.

WALLACE, Circuit Judge:

The government, pursuant to 18 U.S.C. § 3731, appeals the district court's pretrial orders suppressing and excluding: (1) certain statements made by Booth in response to questioning before *Miranda* warnings were given; (2) the identification testimony of three of five bank robbery eyewitnesses; (3) a list of gun stores and ammunition; and (4) the testimony of the government's fingerprint expert. The government also appeals the district court's evidentiary ruling allowing Booth's expert witness to testify regarding visual identification and the district court's order dismissing the indictment. We affirm in part, and reverse and remand in part.

I

At 11:15 a.m. on April 30, 1980, the Sandy Boulevard Branch of the United States National Bank was robbed by three men wearing Halloween masks and gloves, and arm-

* Honorable Edmund L. Palmieri, United States District Judge, Southern District of New York, sitting by designation.

ed with hand guns and an automatic weapon. A fourth person drove the get-away car. Over $32,000 was stolen.

Shortly after the robbery, a description of the perpetrators was broadcast over the police radio. One of the suspects was described as follows:

Male, white, 5′5″ to 5′6″, medium build, dark, curly, collar-length hair, blue and white swirled Hawaiian shirt, small checkered plaid pants, dark and light colored checks, gloves. The suspect had small hands, was wearing a Halloween mask of an ugly man, armed with a small pistol, believed to be a .32 caliber.

Less than one hour later, Officer Mitcham of the Portland Police Bureau observed Booth walking in an area 3½ miles from the bank. He appeared to match the description. After Mitcham asked for and received a rebroadcast of the description, he stopped his motorcycle beside Booth and advised him that he would like to talk to him for a minute. Mitcham then got off his motorcycle and told Booth to put his hands on top of his head. While Mitcham conducted a pat-down search for weapons, he advised Booth that there had been a hold-up in the area and that Booth matched the description of one of the suspects. Even though he found no weapons, he advised Booth that he was placing him in handcuffs for Mitcham's personal safety. While waiting for a requested police car, Mitcham asked Booth his name, age, and place of residence. He also asked Booth if he had any identification, what he was doing in the area, and whether he had been arrested before. Booth responded with his name, that he was 37 years old, and that he lived in Salem, Oregon. He told Mitcham that he had no identification, that he was visiting friends in Portland, and that he had been paroled the month before from a prison term he received for a burglary that had taken place in Salem.

Booth was then transported to the bank for a "show-up" identification. Before he arrived at the bank, the bank employees who had witnessed the robbery filled out robbery description cards, on which they wrote their descriptions of the robbers. FBI agent Schreuder told the witnesses that a "suspect" who was not necessarily involved in the robbery would be brought in for identification. He also told the witnesses that the person would be handcuffed, but that they were not to infer that he had done anything wrong. Schreuder explained that the handcuffs were standard procedure for the protection of the officer, the suspect, and the witnesses. He instructed the witnesses to decide whether they had seen him on their own, without conferring with anyone else, and not to discuss anything among themselves until they had filled out their comments.

Booth, with his hands handcuffed behind his back, was then taken before the group of witnesses who viewed him for approximately one minute and then recorded their observations. The witnesses were subsequently interviewed regarding their recorded observations. After some of the witnesses identified Booth as one of the robbers, he was taken into a bank conference room where he was formally arrested and advised of his *Miranda* rights.

Shortly after the robbery, a car believed to be the get-away vehicle was recovered. The interior and exterior of the vehicle were examined for latent fingerprints but none were found. The fingerprint examiner, Aho, concluded that the occupants had either worn gloves or had wiped fingerprints from the vehicle. The only physical evidence recovered from the vehicle was the tip of a surgical glove.

FBI agents later secured a warrant to search the Sandy Boulevard Bargain Center, a commercial establishment located several blocks from the bank. The following items were recovered from the store: (1) a photograph of Booth and three other men; (2) an envelope addressed to Booth's sister; (3) a list of various gun stores and ammunition; (4) a sketch, allegedly of the bank, that had been torn into many pieces and discarded in a wastepaper basket; and (5) three pairs of surgical gloves.

Following his arraignment, Booth filed motions to suppress the eyewitness identifi-

cations, the statements made to Mitcham and the physical evidence recovered from the Sandy Boulevard Bargain Center. Booth also moved to exclude the deposition of Aho, the government's fingerprint expert, on grounds of relevance.

The district court conducted a hearing that resulted in the suppression and exclusion of the following evidence: (1) Booth's statements to Mitcham regarding why he was in the area and whether he had previously been arrested; (2) the identification testimony of three of the five witnesses who had viewed Booth in the show-up; (3) the list of gun stores and ammunition recovered from the Sandy Boulevard Bargain Center; and (4) Aho's deposition.

The government then requested a continuance to enable it to prosecute an interlocutory appeal pursuant to 18 U.S.C. § 3731. Booth filed a motion to dismiss the indictment, pursuant to Federal Rule of Criminal Procedure 48(b), on the ground that the government had unnecessarily delayed in bringing him to trial. The district court ordered the indictment dismissed without prejudice. The government appealed this order, and we subsequently granted its motion to consolidate the two appeals.

## II

The district judge found that Booth was in custody when he told Mitcham he was in Portland visiting friends and that he was on parole for burglary. The judge also found that Mitcham's questions regarding why Booth was in the area and whether he had previously been arrested constituted interrogation. Thus, because no *Miranda* warnings had been given prior to the custodial interrogation, the district judge suppressed Booth's answers.

Neither of the parties assisted us with cases or analysis pertaining to what constitutes "custody" or "interrogation" or what our standard of review on these issues should be. The district court's findings of fact at the suppression hearing are reviewable pursuant to the clearly erroneous standard. *United States v. Walther*, 652 F.2d 788, 791 (9th Cir. 1981). However, we first must decide whether the district court's determinations of when a defendant is in custody and when police questioning constitutes interrogation are factual findings.

█ Whether a person is in "custody or otherwise deprived of his freedom of action in any significant way," *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), is answered by reviewing the totality of facts involved at the time of the alleged restraint. Pertinent areas of inquiry include the language used by the officer to summon the individual, the extent to which he or she is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention and the degree of pressure applied to detain the individual. Based upon a review of all the pertinent facts, the court must determine whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave. *United States v. Patterson*, 648 F.2d 625, 632 (9th Cir. 1981); *United States v. Scharf*, 608 F.2d 323, 325 (9th Cir. 1979); *United States v. Luther*, 521 F.2d 408, 410 (9th Cir. 1975) (per curiam); *Lowe v. United States*, 407 F.2d 1391, 1397 (9th Cir. 1969). This objective test is not substantially different from other determinations we have held to be factual. *See, e. g., United States v. Huberts*, 637 F.2d 630, 635 (9th Cir. 1980), *cert. denied*, 451 U.S. 975, 101 S.Ct. 2058, 68 L.Ed.2d 356 (1981); *United States v. Hood*, 493 F.2d 677, 680 (9th Cir.), *cert. denied*, 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974) (founded suspicion); *United States v. Franco*, 638 F.2d 1206, 1208 (9th Cir. 1981); *United States v. Thompson*, 558 F.2d 522, 524–25 (9th Cir. 1977), *cert. denied*, 435 U.S. 914, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1978) (probable cause); *United States v. Flickinger*, 573 F.2d 1349, 1357 (9th Cir.), *cert. denied*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978) (exigent circumstances); *United States v. Wasserteil*, 641 F.2d 704, 707 (9th Cir. 1981) (consent to search); *United States v. Diggs*, 649 F.2d 731, 735 (9th Cir. 1981), *cert. denied*, ── U.S. ──, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981) (abandon-

ment); *United States v. Glover*, 596 F.2d 857, 865 (9th Cir.), *cert. denied*, 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979); *United States v. Botero*, 589 F.2d 430, 433 (9th Cir. 1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979); *United States v. O'Looney*, 544 F.2d 385, 389 (9th Cir.), *cert. denied*, 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976) (knowing and voluntary waiver of *Miranda* rights); *compare United States v. Chesher*, 654 F.2d 1285, 1295 (9th Cir. 1981) (sufficiency of affidavits supporting warrant); *United States v. Lopez-Diaz*, 630 F.2d 661, 665 n.3 (9th Cir. 1980) (implied waiver of *Miranda* rights). Indeed, testing the reaction of a reasonable person is nearly identical to the standard applied to the issue of negligence, which is reviewable pursuant to the clearly erroneous standard in almost all the circuits. *Miller v. United States*, 587 F.2d 991, 994 (9th Cir. 1978). While there is some persuasive reasoning to the contrary, *see, e. g., United States v. Mesa*, 638 F.2d 582, 591 n.3 (3d Cir. 1980) (Adams, J., concurring) (" 'custodial interrogation' is a legal term of art central to *Miranda* jurisprudence . . . and a matter of law to be determined in accordance with the policies underlying the *Miranda* rule"), our prior cases in similar areas lead us to hold that our review of this issue should be by the clearly erroneous standard.[1]

■ The government argues that Booth was not in custody when he was questioned by Mitcham. The government contends that the detention of Booth was merely an investigatory stop justified by reasonable suspicion. *See, e. g., Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Handcuffing a suspect does not necessarily dictate a finding of custody.

*See United States v. Purry*, 545 F.2d 217, 220 (D.C.Cir.1976). Strong but reasonable measures to insure the safety of the officers or the public can be taken without necessarily compelling a finding that the suspect was in custody. *See United States v. Coades*, 549 F.2d 1303, 1305 (9th Cir. 1977). The officers may take reasonable steps to maintain the status quo. *United States v. Patterson, supra*, 648 F.2d at 633. We conclude, however, that the district judge was not clearly erroneous in finding Booth to be in custody. Booth was told that he matched the description of a suspected bank robber and was then searched for weapons and handcuffed. A police car was requested by Mitcham to transport Booth. A reasonable innocent person in such circumstances might very well have concluded that he was not free to leave after brief questioning. While we might come to a different conclusion than did the district judge, we cannot say, viewing the totality of facts before him, that his determination that Booth was in custody for *Miranda* purposes was clearly erroneous.

■ We therefore turn to whether the questioning in this case constituted interrogation, requiring prior *Miranda* warnings. The government contends that the questions asked were within the scope of permissible inquiry following an investigatory stop. The cases relied on by the government, however, all involve situations in which we concluded that the defendant was not in custody for *Miranda* purposes at the time he was questioned. Here, in contrast, Booth was in custody when he was directly questioned by Mitcham. We recognize that the extent of justifiable questioning during an investigatory stop and the scope of custodial interrogation are similar issues, and

1. We have, on occasion, suggested that the "independent examination" standard of *Ker v. California*, 374 U.S. 23, 33–34, 83 S.Ct. 1623, 1629–30, 10 L.Ed.2d 726 (1963), should govern our review of probable cause determinations. *See United States v. Bates*, 533 F.2d 466, 468 (9th Cir. 1976); *United States v. One Twin Engine Beech Airplane*, 533 F.2d 1106, 1108–09 (9th Cir. 1976) (per curiam). *See also United States v. Kendall*, 655 F.2d 199, 203 (9th Cir. 1981) (abandonment). The case before us

deals with the Fifth rather than the Fourth Amendment. Thus, we need not decide which standard of review is appropriate on the issue of probable cause. We point out, however, that we have applied the clearly erroneous standard in more recent cases notwithstanding the Court's admonishment in *Ker, see United States v. Kendall, supra; United States v. Franco*, 638 F.2d 1206, 1208 (9th Cir. 1981), and that we have never relied on *Ker* outside of Fourth Amendment cases.

that both may be present in the same case. *See United States v. Kennedy*, 573 F.2d 657 (9th Cir. 1978). Nonetheless, they are separate and distinct questions. We have consistently held that even though one's freedom of action may be inhibited to some degree during an investigatory detention, *Miranda* warnings need not be given prior to questioning since the restraint is not custodial. *See United States v. Collom*, 614 F.2d 624, 628 (9th Cir. 1979), *cert. denied*, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980); *United States v. Hickman*, 523 F.2d 323, 327 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976). While a police officer is authorized to make limited inquiries when effecting an investigatory stop justified by reasonable suspicion, that authority does not extend to situations in which the suspect has been placed in custody.

The government also argues that Booth was not subject to interrogation since all of the questions asked were objective and "essentially neutral," unrelated to the crime or Booth's suspected participation in it. The government contends that there is no rational basis for distinguishing questions asking a suspect his name and residence from questions asking his reason for being in the area or his prior arrest record. We disagree. In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (*Innis*), the Supreme Court considered what sorts of words or conduct on the part of the police constitute "interrogation." The Court held that interrogation may be "either express questioning or its functional equivalent," *id.* at 300–01, 100 S.Ct. at 1689, and defined the latter to include any statements or actions "that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1690 (footnotes omitted). We admit that the Court's opinion appears to assume that direct questioning of a suspect in custody always constitutes interrogation. Other courts have so held. *See, e. g., Proctor v. United States*, 404 F.2d 819, 820–21 (D.C.Cir.1968) (*Miranda* applies to all custodial questioning, regardless of benign purpose or potential).

However, we believe the reasoning supporting the Court's decision, indeed the very purpose behind *Miranda* itself, compels the conclusion that not every question posed in a custodial setting is equivalent to "interrogation."

*Miranda* was, and remains, a prophylactic device designed to protect the exercise of Fifth Amendment rights by criminal defendants. Absent procedural safeguards, custodial interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona, supra*, 384 U.S. at 467, 86 S.Ct. at 1624. The mere existence of custody alone, however, does not necessarily give rise to these inherent psychological pressures. Thus, the "spontaneous" or "volunteered" confession of a suspect in custody is admissible despite the absence of prior *Miranda* warnings. *Id.* at 478, 86 S.Ct. at 1630; *Pavao v. Cardwell*, 583 F.2d 1075, 1077 (9th Cir. 1978) (per curiam). As the Court stated in *Innis*, " '[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." 446 U.S. at 300, 100 S.Ct. at 1689.

There is no reason why this principle should not apply to express questioning as well as its "functional equivalent." Certainly not every question is an interrogation. Many sorts of questions do not, by their very nature, involve the psychological intimidation that *Miranda* is designed to prevent. A definition of interrogation that included any question posed by a police officer would be broader than that required to implement the policy of *Miranda* itself. We hold, therefore, that custodial questioning constitutes interrogation whenever, under all the circumstances involved in a given case, the questions are "reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689 (footnotes omitted).

This determination, like that of whether a suspect was in custody, must be

made on a case-by-case basis. *See United States v. Rubies*, 612 F.2d 397, 404 n.8 (9th Cir. 1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980). The test is an objective one, however, and thus the subjective intent of the police, while relevant, is not conclusive. *Innis*, 446 U.S. at 301, 100 S.Ct. at 1690. It is not sufficient, as the government contends, merely that a question is "objective" or that it was not asked in an attempt to elicit evidence of crime. *Harryman v. Estelle*, 616 F.2d 870, 874 (5th Cir.) (en banc), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). Even a relatively innocuous question may, in light of the unusual susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 302 n.8, 100 S.Ct. at 1690 n.8. On the other hand it is relevant, but not determinative, that a question posed was not related to the crime or the suspect's participation in it. Ordinarily, the routine gathering of background biographical data will not constitute interrogation. *United States ex rel Hines v. La Vallee*, 521 F.2d 1109, 1112–13 (2d Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976). *See also United States v. Lamonica*, 472 F.2d 580 (9th Cir. 1972) (inventory of suspect's belongings). Yet we recognize the potential for abuse by law enforcement officers who might, under the guise of seeking "objective" or "neutral" information, deliberately elicit an incriminating statement from a suspect. Thus we emphasize that the ultimate test for whether questioning constitutes interrogation is whether, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response.[2]

Since this determination is essentially factual, it should be reviewed, as is the question of custody, pursuant to the clearly erroneous standard. We conclude that, under the circumstances of this case, the district judge was not clearly erroneous when he found that the questions relating to Booth's reason for being in Portland and his prior arrest record constituted interrogation. Both of Booth's responses proved to be "incriminating" in that the prosecution has sought to introduce them at trial. *Innis*, 446 U.S. at 301 n.5, 100 S.Ct. at 1689 n.5. The question about prior arrests clearly sought just such a response. While it is a close call, we can not say it was clearly erroneous to find that a reasonable police officer should have concluded that when asked his reason for being in the area, Booth would respond with an assertion—either a denial of complicity, an admission, or an alibi—that might later be used against him. Nothing, on the other hand, indicates that the questions relating to Booth's identity, age and residence were at all likely to elicit an incriminating response. These routine, non-investigatory questions were totally unrelated to the crime, and the record does not reveal that Booth was "particularly susceptible" to this line of inquiry. Thus, while we need not decide the scope of possible questions that may be posed to a suspect in custody absent the procedural safeguards required by *Miranda*, we conclude that the

---

**2.** Justice Powell's opinion in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (Powell, J., concurring in the result), provides support for our conclusion. In *Edwards*, the majority held that once a suspect in custody requests counsel, he may not be interrogated further by the police until his attorney has been "made available" to him, unless the suspect "initiates" the conversation. *Id.* 101 S.Ct. at 1884-85. Justice Powell stressed that, in his view, the case could have been decided under the traditional notions of waiver set out in *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). He further stated, however, that there were situations involving "typical, and permissible, custodial communi-

cations between police and a suspect...." 101 S.Ct. at 1888. He cautioned that "police do not impermissibly 'initiate' renewed interrogation by engaging in routine conversations with suspects about unrelated matters." *Id.* We conclude from this that some sorts of "routine" custodial questioning will not constitute "interrogation" within the meaning of *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The basic test, though, is whether the questioning was reasonably likely to elicit an incriminating response. The degree to which the questions are routine or involve matters unrelated to the crime will be important factors in making such a determination.

district judge did not err when he found that asking Booth his name, age and residence did not constitute interrogation.

## III

The district court also suppressed the identification testimony of three of the five eyewitnesses who viewed the defendant during the show-up at the bank. The district court found that the show-up procedure was "highly suggestive" and "corruptive." Relying on *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the district court then analyzed the testimony of each of the five eyewitnesses "to determine whether there [was] a likelihood of misidentification and whether the overall factors [would] result in an appropriate or fair identification." Based upon this analysis, the court suppressed the testimony of three of the eyewitnesses.

■■■■ The district judge appears to have based his conclusion that the show-up procedure was inherently suggestive upon his finding that there were no exigent circumstances requiring Booth to be handcuffed and taken back to the bank for the show-up. We have held, however, that a show-up is a permissible means of identification without requiring a showing of exigency. *United States v. Williams*, 626 F.2d 697, 703 (9th Cir.), *cert. denied*, 449 U.S. 1020, 101 S.Ct. 586, 66 L.Ed.2d 482 (1980); *United States v. Coades, supra*, 549 F.2d at 1305. In addition, we conclude that the district judge applied the wrong standard to assess the reliability of each witness's identification. The test is not whether there is a likelihood of misidentification and whether the overall factors will result in an appropriate or fair identification. Rather, the district judge should determine whether in the totality of circumstances the "procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct.

967, 971, 19 L.Ed.2d 1247 (1968); *United States v. Field*, 625 F.2d 862, 865 (9th Cir. 1980). Therefore, we remand to the district court for application of the appropriate standard.

## IV

■■ The government also desired to introduce as evidence a list of gun stores and ammunition to show that Booth used guns, and therefore put people's lives in danger during the commission of the bank robbery, in violation of 18 U.S.C. § 2113(d).[3] The district court excluded this evidence on the ground that it would be "highly prejudicial" and of little probative value because: (1) the list was not in Booth's handwriting; (2) the list was not found within the immediate vicinity of Booth's other possessions; (3) the list did not have Booth's fingerprints on it; and (4) the government was unable to connect Booth with the list. This conclusion was apparently based upon Federal Rule of Evidence 403, which provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403.

■■ Our review of the district judge's exclusion of the list is limited to whether the judge has abused his discretion. *United States v. Martin*, 599 F.2d 880, 889 (9th Cir.), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067 (1979). We find that he has. The list has evidentiary value to show that Booth put the lives of the bank employees in jeopardy with the use of a firearm in violation of 18 U.S.C. § 2113(d). The government concedes that to satisfy its burden of proof on this count, it must establish that at least one of the weapons used in the robbery was loaded. Presumably the government would attempt to prove

---

**3.** 18 U.S.C. § 2113(d) provides:

Whoever, in committing, or in attempting to commit, any [bank robbery], assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.

this by offering the list, together with testimony that the weapons depicted in the surveillance photographs appear to be authentic. Although it is not necessary for the government to have direct evidence that the guns were loaded, there must be sufficient evidence for the jury reasonably to infer that fact. *United States v. Jones*, 512 F.2d 347, 351–52 (9th Cir. 1975). The list was found in the employee area of the store, along with various other items of evidence that tend to establish Booth's association with the store. Thus, we conclude that the gun list is relevant to the firearm violation. Relevant evidence is not rendered inadmissible merely because it is prejudicial. *United States v. Mahler*, 452 F.2d 547, 548 (9th Cir. 1971), *cert. denied*, 405 U.S. 1069, 92 S.Ct. 1517, 31 L.Ed.2d 801 (1972). Instead, evidence should be suppressed under Rule 403 only when it presents a danger of "unfair prejudice." There was no such unfair prejudice in this case.

### V

▪▪▪ The government sought to introduce criminologist Aho's deposition testimony that there were no fingerprints found on the get-away vehicle and the reason why no fingerprints were found. The court found this testimony was irrelevant because, in the absence of any showing by the government that this was Booth's modus operandi, it did not tie Booth to the robbery. The district judge's ruling excluding expert testimony on relevancy grounds should not be disturbed unless he abused his discretion. *See United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir. 1973). The district judge did not abuse his discretion in ruling that the expert should not be permitted to testify that the reason there were no fingerprints on the get-away vehicle was because the occupants had either used gloves or wiped fingerprints from the vehicle. Federal Rule of Evidence 702 requires that a witness qualify as an expert "by knowledge, skill, experience, training, or education . . . ." The government has failed to show that Aho's training qualifies him as an expert

with respect to the reason no fingerprints were found on this vehicle. The trier of fact is capable of inferring why no fingerprints were found without the assistance of expert testimony.

Aho is qualified as an expert, however, to state that no fingerprints were found on the vehicle. That evidence is relevant in light of the surgical gloves found in the Sandy Boulevard Bargain Center, the tip of the surgical glove found in the vehicle and the fact that the bank robbers wore gloves described as flesh or skin colored. Thus, the district judge abused his discretion in failing to admit the Aho deposition to prove that no fingerprints were found.

### VI

▪▪▪ The district court granted Booth's motion to admit the testimony of a witness identification expert, Murch. Murch's testimony concerns the general problems encountered with visual identification. The government argues that the district court erred in admitting the testimony because it is irrelevant and because Booth failed to show Murch qualified as an expert pursuant to Federal Rule of Evidence 702.

Although we are sympathetic with the government's position, we have no jurisdiction to review this issue. This appeal was taken by the government pursuant to 18 U.S.C. § 3731. That statute provides in part that: "[a]n appeal by the United States shall lie to a court of appeals from a decision or order of a district courts [sic] suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding . . . ." Because section 3731 gives the government the right to appeal only the suppression or exclusion of evidence, and not its admission, this issue is not subject to review by us at this time.

### VII

After the government had filed its notice of appeal, the district court dismissed the indictment without prejudice, pursuant to

Federal Rule of Criminal Procedure 48(b),[4] for unnecessarily delaying the trial. The government may appeal the district court's suppression or exclusion of evidence "if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is substantial proof of a fact material in the proceeding." 18 U.S.C. § 3731. The district judge dismissed the indictment because he found that the government had failed to demonstrate that the evidence suppressed was "substantial proof of a fact material in the proceeding."

We interpreted the government's section 3731 right to appeal in *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979) (en banc), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1279, 63 L.Ed.2d 602 (1980), and concluded that three conditions must be satisfied before the government can appeal a suppression order: "First, the appeal is not available if the defendant has been put in jeopardy. Second, the appeal must not be taken for purposes of delay. Third, the evidence suppressed must be substantial proof of a fact material in the proceeding." *Id.* at 1150. *Loud Hawk* involved a multi-count indictment that charged the defendants with possession of firearms, including dynamite. The trial court suppressed the dynamite and the government appealed pursuant to section 3731. The district court then dismissed the indictment with prejudice. We upheld the dismissal of the non-dynamite counts because the suppressed dynamite evidence was not substantial proof of any material fact in the non-dynamite counts of the indictment. We did, however, remand the case to the district court to reconsider its dismissal of the non-dynamite counts with prejudice. *Id.* at 1151. We reversed the district court's dismissal of the indictment as to the dynamite counts. We found that the defendants had not yet been placed in jeopardy. The appeal was not taken for purpose of delay because any delay was necessary to permit the government to exercise its right to appeal under section 3731. Further, the suppressed evidence, the dynamite, was a necessary element of the government's burden of proof. Therefore, we concluded that the delay was not "unnecessary" within the meaning of Rule 48(b). *Id.* at 1150.

In the case before us, Booth has not yet been placed in jeopardy. Any delay in bringing Booth to trial was necessary to permit the government to exercise its section 3731 appeal. At least some of the suppressed evidence was substantial proof of the government's case. The suppressed identification testimony was necessary to identify Booth as one of the robbers. Thus, like the necessity of the dynamite evidence to the *Loud Hawk* case, the identification evidence was substantial proof of Booth's identity as one of the robbers. In light of the broad construction that we give to the government's right to appeal under section 3731, *see United States v. Humphries*, 636 F.2d 1172, 1175 (9th Cir. 1980), we hold that the district court erred in dismissing the indictment pursuant to Rule 48(b). On remand, it should be reinstated.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

---

4. Rule 48(b) provides:

   If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint. Fed.R.Crim.P. 48(b).