Rose, J.,
dissenting:
I find numerous serious faults with the majority opinion and, therefore, must dissent.

The district court erred in concluding that no custodial interrogation occurred

The first error occurred when the district court permitted a sheriff’s deputy to testify regarding Nika’s incriminating statements given during a jailhouse classification interview conducted after Nika had invoked his Miranda rights. This issue was raised in district court, but was not addressed in Nika’s briefs to this court. However, we can address constitutional issues sua sponte. McCullough v. State, 99 Nev. 72, 74, 657 P.2d 1157, 1158 (1983). The fact that Nika’s counsel apparently conceded this point at oral argument is not binding on this court and seems more the product of poor lawyering rather than a competent adversarial decision.
Nika was questioned in Chicago on August 30, 1994, by Detective John Yaryan, and at that time, invoked his right to have an attorney present.[1] Thereafter, Nika was extradited to Nevada *1446 on September 1, 1994, and booked into the Washoe County jail. Nika’s clothes were taken from him, and he was removed from the booking detention area and placed into a housing unit. On September 2, 1994, Nika had eaten a meal and was mixing with the general prison population when Colleen Villa, a plain-clothed deputy with the Washoe County sheriff’s department who worked in the classification unit at the county jail, took Nika aside to ask him some questions from the classification form. Villa testified that every inmate had to answer the questionnaire so that the jail administrators could place the inmate in a safe housing unit. Villa also testified that she knew that Nika had been arrested for murder and also knew some of the facts of the case prior to interviewing Nika.
One of the questions Villa asked Nika was, “Have you ever assaulted or battered anyone?” Nika responded that he had fought with a man around 9:00 p.m. or 9:30 p.m. one evening and that the man was dead. He also stated that during the fight a gun was placed to “his” head, although Villa testified that she was unsure if that meant a gun was placed to Nika’s head or that Nika had placed a gun to the victim’s head.
At the outset, I would like to state that jail personnel should be permitted to ask any question they feel necessary for the orderly and safe confinement of a prisoner. The admission of the answers given by the inmate at trial is quite another matter, especially when the prisoner has invoked his Fifth Amendment right to remain silent and then is asked specific questions about whether he has ever committed the crime in question or a lesser-included crime. My response to this problem is certainly not to prevent jail personnel from asking even those questions if they feel it necessary. Rather, the admissibility of this evidence should be where the remedy is applied. To ascertain the nature and extent of that remedy, we must examine the law that has developed in this area.
An individual subjected to a custodial interrogation must be given his or her Miranda rights. Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). Unless and until the Miranda rights are given and a waiver of those rights is obtained, no evidence procured as a result of the interrogation can be used against the defendant. Miranda v. Arizona, 384 U.S. 436, 479 (1966). However, a well-established line of cases has created an exception to the Miranda rule for “routine booking questions” because such questions are not related to the investigation of the case and serve a legitimate administrative need. Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990); United States v. Booth, 669 F.2d 1231, 1238 (9th Cir. 1981); Franks v. State, 486 S.E.2d 594, 597 (Ga. 1997). Routine booking questions are limited to “ ‘biographical data necessary to complete booking or pretrial services.’ ” *1447 Muniz, 496 U.S. at 601 (quoting United States v. Horton, 873 F.2d 180, 181 n.2 (8th Cir. 1989)); see also Franks, 486 S.E. 2d at 597 (stating that basic biographical data is limited to a suspect’s name, age, address, educational background, marital status, and any other information required.to complete an arrest form).
The Ninth Circuit Court of Appeals has stated that while ordinarily routine gathering of background biographical data will not constitute interrogation,
we recognize the potential for abuse by law enforcement officers who might, under the guise of seeking “objective” or “neutral” information, deliberately elicit an incriminating statement from a suspect. Thus we emphasize that the ultimate test for whether questioning constitutes interrogation is whether, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response.
Booth, 669 F.2d at 1238. This analysis must be made on a case-by-case basis. Id. at 1237-38.
The questions Deputy Villa asked Nika went beyond routine background information and were not completely unrelated to the underlying offense, even though they undoubtedly served the legitimate administrative need of classifying jail inmates. The questions posed to Nika were broad in nature and asked for intimate details of Nika’s life, including his criminal history, gang affiliation, and sexual orientation. However, the question concerning whether Nika ever committed a battery on anyone was more specific and inquired about a lesser-included crime of the murder charge. If the response to this type of question is incriminating, it should not be admitted at trial. In this way, the exception to the ban on questioning a prisoner who has invoked his right to remain silent will not engulf the general rule. See People v. Rucker, 605 P.2d 843, 855 (Cal. 1980) (concluding that jail officials can satisfy their demonstrated need for certain basic information necessary for proper jail administration, but the prosecution may not use the arrestee’s responses in any manner in the criminal proceedings).[2]
*1448 Additionally, and more importantly, the questions Deputy Villa asked Nika were such that she should have known they were reasonably likely to elicit an incriminating response. Nika was arrested for murder, and the question, “Have you ever assaulted or battered anyone?” while presumably asked for a neutral reason, was asking Nika about a lesser-included offense. Furthermore, Nika did not speak English well, and in light of the transcript of the suppressed interview with Yaryan, it is clear that Nika did not understand with any degree of certainty his constitutional rights to have an attorney present and to remain silent. Despite the fact that Villa was reading from a standardized form, she knew that Nika had been arrested for murder, knew the details of the murder, and should have known, especially in light of Nika’s unusual susceptibility, that the question was reasonably likely to elicit an incriminating response. Booth, 669 F.2d at 1238. Therefore, I believe that using Nika’s answer to that question during trial was in violation of Nika’s right to be free from custodial interrogation after he had invoked his Fifth Amendment rights.
Furthermore, the admission of the evidence was not harmless error because it cannot be proven beyond a reasonable doubt that the evidence did not contribute to the verdict. Chapman v. California, 386 U.S. 18, 24 (1967). Nika’s statements to Villa constituted an admission that he had been involved in Smith’s death in some fashion, although he did not admit specifically to Smith’s murder; this information likely influenced the jury’s decision.
Based on this violation of Nika’s federal constitutional rights, I believe that Nika is entitled to a new trial.

Inadequate instructions concerning NRS 200.033(9), the random and without apparent motive aggravator

The jury was presented with three aggravating circumstances to consider in the penalty phase of this trial, whether the murder was committed during the commission of or attempt to commit a robbery, whether the killing was done to avoid arrest or effect an escape, and whether the murder was committed “at random and without apparent motive.” The jury rejected the first two aggra-vators, but found that the killing was done at random and without apparent motive.
The jury’s rejection of the “murder in the course of a robbery” and “murder to flee” aggravators and finding the “random and motiveless” aggravator was unusual considering the facts. There is abundant evidence to demonstrate that the killing was done to facilitate a robbery or escape, and had the jury found either aggravator, this would be a routine affirmance. By the brutal, execution-style killing, Nika has proven that he in general quali *1449 fies for the death penalty. But, when the jury returned only the one “random and motiveless” aggravator, we are compelled to determine whether the legal instructions given the jury were adequate for this case and if the facts presented support this sole aggravator. To put it simply, we must determine whether Nika’s execution can be sanctioned by the rules with the facts as found by the jury.
The jury obviously considered whether NRS 200.033(9), the aggravating circumstance alleging that the murder was committed “at random and without apparent motive,” had been proven beyond a reasonable doubt. The only assistance the jury received in considering this aggravator was the instruction that it could find that NRS 200.033(9) had been proven beyond a reasonable doubt if it concluded that the killing “was not necessary to complete a robbery.'” (Emphasis added.) This instruction was derived from our opinions in Bennett v. State, 106 Nev. 135, 143, 787 P.2d 797, 802 (1990), and Paine v. State, 107 Nev. 998, 999-1000, 823 P.2d 281, 282 (1991).[3] Since the jury rejected the “murder in the course of a robbery” aggravator, it seems logical to assume that the above instruction would be inapplicable since it dealt with a killing accompanying a robbery. This left the jury with only the language of NRS 200.033(9), a murder committed at random and without apparent motive.
We have never required that the random and without apparent motive aggravator be defined beyond stating to the jury the aggravator as defined in NRS 200.033(9). See, e.g., Greene v. State, 113 Nev. 157, 163, 931 P.2d 54, 58 (1997); Geary v. State, 112 Nev. 1434, 1445-46, 930 P.2d 719, 726 (1996). However, in this and several other cases, this court has struggled with the meaning of those terms and the application of those terms to the facts of a particular case. The facts of this case are not those that come to mind when you first think of a random and motiveless crime, as does the shooting of people from a rooftop or driving indiscriminately into pedestrians on a sidewalk. Here, Nika obviously had just met the good Samaritan who apparently stopped to help him, and Nika killed him in the course of robbing him, or because the Samaritan called him a foul name, or to aid his escape, or for no reason at all. The jury concluded Nika killed for *1450 no apparent reason at all, and it was the jury’s prerogative to so conclude even if the other reasons may seem more plausible.
It is much more difficult to see how the jury concluded that Nika killed the Samaritan “at random.” He obviously had just met the Samaritan who stopped to help him, and it is not at all apparent to me how Nika’s killing could be classified as “at random” even if done without apparent motive. Perhaps the jury believed that it was uncertain who might stop to help Nika, and this was sufficient to provide the randomness element needed to find the aggravator. However, this is not the randomness I believe that the legislature contemplated when approving this aggravator.
This case seems closer to the factual situation presented in Geary where we held that the “random and without apparent motive” aggravator was constitutional; however, we reversed Geary’s death penalty conviction because the evidence presented at trial indicated that the killing was neither random nor motiveless because the killing was directed at a specific individual and was done for a specified reason. Geary, 112 Nev. at 1446, 930 P.2d at 727. I see little difference between the situation presented in Geary and that in the present case. What all this demonstrates to me is that we need to define the terms used in this aggravator to better assist the jury in its difficult task of applying this aggravator to the facts of cases like this one.
Defining the terms “random,” “apparent,” and “motive” will give the jury guidance and “genuinely narrow the class of persons eligible for the death penalty.” Zant v. Stephens, 462 U.S. 862, 877 (1983). We began this process in Geary v. State, 112 Nev. 1434, 1446-47, 930 P.2d 719, 727 (1996), but did not provide concrete definitions. The word “random” means either lacking a definite plan, purpose or pattern, or relating to a set whose elements have equal probability of occurring. Webster’s Ninth New Collegiate Dictionary 974 (9th ed. 1985). NRS 200.033(9) states that the murder must be “committed upon one or more persons at random and without apparent motive,” and I believe that the statute is properly understood to mean that the victim must be selected at random and the crime must be committed on that randomly selected victim without apparent motive.
“Apparent” means or has been stated to mean “open to view” or “clear or manifest to the understanding.” Webster’s Ninth New Collegiate Dictionary 96 (9th ed. 1985); see also, State v. Moore, 553 N.W.2d 120, 128 (Neb. 1996) (“Apparent” means that which is “readily perceptible”); Black’s Law Dictionary 96 (6th ed. 1990) (“That which is obvious, evident, or manifest .... That which appears to the eye or mind; open to view; plain; patent.”).
“Motive” has been defined as the “emotional urge which *1451 induces a particular act.” 1 Witkin & Epstein, Cal. Criminal Law § 100, at 118-19 (2d ed. 1988); see also 21 Am. Jur. 2d Criminal Law § 133, at 267 (1981) (“motive may be defined as that which leads or tempts the mind to indulge in a criminal act, or as the moving power which impels to action for a definite result”); United States v. Beechum, 582 F.2d 898, 912 n.15 (5th Cir. 1978) (“motive . . . has been defined as ‘the reason that nudges the will and prods the mind to indulge the criminal intent’ ”) (quoting Slough & Knightly, Other Vices, Other Crimes, 41 Iowa L. Rev. 325, 328 (1956)).
According to these definitions, any emotional urge or passion which prompts a person to act will qualify as a motive. Commonly understood motives for murder include avarice, revenge, jealousy, fear, preventing discovery of a crime, evading arrest or prosecution, and conduct of the deceased in opposing or trying to injure the defendant. 1 Witkin & Epstein, Cal. Criminal Law § 100, at 119 (2d ed. 1988); Wigmore, Principles of Judicial Proof § 96, at 193 (2d ed. 1931). Being insulted can also be a motive for murder. See State v. Garcia, 664 P.2d 969, 973 (N.M. 1983) (concluding that evidence existed to support a theory that the deceased had insulted the defendant’s prison gang and the insult was the defendant’s motive for the killing). I believe that defining the words used in this aggravator will assist juries in determining whether the facts fit this aggravator and it will increase our confidence that the correct factual determination was made when reviewing the case on appeal. I conclude that failing to give definitions of the critical words used in this aggravator left the jury with unreasonably vague guidelines when confronted with the facts of this case and that this case should be reversed and retried for that reason.

The State’s inconsistent arguments on Nika’s motive to kill

Finally, I believe that it was improper for the State to argue during the guilt phase that Nika acted with a motive and then argue during the penalty phase that Nika acted without a motive. At trial, the prosecution presented a jailhouse snitch who testified that Nika told him that he had killed Smith because Smith had called him a “motherfucker,” a term that Nika stated was a grave insult in his country of origin. Because the prosecution elicited this testimony in the guilt phase to show that Nika killed Smith and why he killed Smith, it cannot in the penalty phase or on appeal legitimately argue that such provocation did not provide Nika with a motive to kill Smith.[4] See Tore, Ltd. v. Rothschild *1452 Management Corp., 106 Nev. 359, 364, 793 P.2d 1316, 1319 (1990) (stating that this court will not permit an attorney or party to argue one theory at trial and another on appeal). The prosecution should not be able to present evidence and argue its validity at one portion of a trial and then repudiate it at another because it no longer serves the State’s purpose.
In conclusion, I believe that Nika’s constitutional rights were violated when his incriminating statement to jail personnel was admitted into evidence. Upon retrial I would discard the definition we have used in Bennett, Paine, and other subsequent cases that permits a finding of random and motiveless killing if murder was not necessary to complete the robbery and then define the three critical terms random, apparent, and motive with specificity.

 The content of that interview was later suppressed by the district court after it concluded that Nika had invoked his right to an attorney but that Yaryan had continued to interrogate Nika.

 In People v. Hall, 245 Cal. Rptr. 458, 461 (Ct. App. 1988), the appellate court stated that California Proposition 8 (adding article 1, section 28(d) to the California Constitution) abrogated Rucker. Proposition 8 stated in pertinent part: “Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding. . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay.” Hall, 245 Cal. Rptr. at 461 n.3. Rucker might have survived Proposition 8 because it relied on the federal Constitution, but in any event, the rationale of Rucker is persuasive and should be followed by this court.

 This court has not always interpreted this aggravating circumstance this way. In Moran v. State, 103 Nev. 138, 142-43, 734 P.2d 712, 714 (1987), and Geary v. State, 112 Nev. 1434, 1446-47, 930 P.2d 719, 727 (1996), we did not use such a definition. Instead, we examined the facts to determine whether the murder was committed without motive and at random, relying on the common usage of those words. Upon reflection, I believe the instruction used in the instant case is incomplete, misleading, and nonsensical, and our legal system would be better olf if it were jettisoned.

 The prosecution also elicited testimony that Nika killed Smith in order to steal his car, but the jury apparently did not believe this testimony because it *1452 did not find that Nika killed Smith in the commission of a robbery pursuant to NRS 200.033(4). However, such testimony provided evidence regarding Nika’s motive, and it was improper for the prosecution to present such evidence of a motive during the guilt phase and then claim during the penalty phase and on appeal that no motive existed.