**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Roman Ferrer RUBIES, and Pedro Vera, Defendants-Appellants.**

**Nos. 78–3003, 78–3007.**

United States Court of Appeals, Ninth Circuit.

Sept. 10, 1979.

Rehearing Denied Feb. 11, 1980.

---

**400**

Daniel H. Smith, Smith, Kaplan, Withey, Theiler & Sowa, Seattle, Wash., Stewart P. Riley, Paul, Johnson, Paul & Riley, Seattle, Wash., on brief for appellant.

J. Ronald Sim, Asst. U. S. Atty., Seattle, Wash., argued and on brief, for appellee.

Before KENNEDY and TANG, Circuit Judges, and BELLONI,* District Judge.

BELLONI, District Judge:

Appellants were convicted by jury verdicts of conspiracy and attempt to import marijuana into the United States. Both appellants are foreign citizens and were aboard a "stateless" vessel, the HELENA STAR, that was carrying a large quantity of marijuana. She was boarded and seized by the United States Coast Guard about 150 miles off the coast of Washington. We affirm.

### FACTS

The YOCONA is a 213 foot United States Coast Guard cutter. On April 15, 1978, she left from Astoria, Oregon, on a general law enforcement patrol. She was scheduled to patrol the Washington coast varying her distance from the coast as circumstances dictated.

During the evening of April 15, a lookout aboard the YOCONA spotted to his west what appeared to be a small airplane that was flying low to the water. At this time the YOCONA was proceeding in a northerly direction and was twelve to fifteen miles offshore, near Grays Harbor, Washington.

The commander of the YOCONA, Commander Charles W. Morgan, was notified of the sighting. Commander Morgan testified that this sighting was unusual, especially because the plane was so near the water. He suspected the plane was looking for a ship, perhaps one engaged in smuggling.

Because of the sighting, Commander Morgan diverted from his original plans to go further offshore and instead continued in a generally northerly direction.

At approximately noon of the following day, April 16, Commander Morgan was called to the bridge because a vessel, subsequently identified as the HELENA STAR, was picked up on the radar screen. At this time, the YOCONA was approximately fifty miles off the coast of Washington. The HELENA STAR was then also approximately fifty miles offshore but was proceeding in an easterly direction toward the mouth of the Strait of Juan de Fuca. This strait is located between northwestern Washington and Vancouver Island, B.C.

The HELENA STAR did not display any flag. Commander Morgan raised her by radio and inquired of her nationality and destination. Someone with a Spanish accent replied in English that the HELENA STAR was British and was headed for Victoria, B.C. Victoria, B.C. is located on Vancouver Island, B.C.

Shortly after this radio contact, the YOCONA, which had maintained her northerly course, passed the stern of the HELENA STAR about a quarter mile distant. It was then that Commander Morgan could clearly read her name "HELENA STAR" and purported home port of "ROAD HARBOUR." ROAD HARBOUR is a small port in the British Virgin Islands. Commander Morgan also noticed a more permanently affixed name, "FRATERNITE," which was welded to her stern, was painted over with green hull paint. The names, HELENA STAR and ROAD HARBOUR, were simply painted in white paint over the green hull paint.

After passing behind the HELENA STAR, the YOCONA relayed the information regarding the sighting to her headquarters and took up a position seven or eight miles astern of the HELENA STAR

* The Honorable Robert C. Belloni, United States District Judge for the District of Oregon, sitting by designation.

and proceeded to follow her in her easterly direction for about two hours. The YOCONA then turned to the north to check some fishing vessels in that area.

About 6:30 p. m. that evening, the YOCONA again sighted the HELENA STAR. At this time she was fifteen to eighteen miles off the coast of Washington; but she was then proceeding outbound in a generally westerly direction. The YOCONA took up a position approximately ten miles astern and began to follow her through the night. As darkness fell the HELENA STAR did not turn on her navigation lights.

The following morning at about 10:00, the Coast Guard headquarters in Seattle notified Commander Morgan that the HELENA STAR was not registered in Great Britain and that the Canadian government did not expect her arrival. The Seattle headquarters further stated that because of these facts and because of her unusual behavior the YOCONA was directed to board her to determine nationality, identification and recent activities. The HELENA STAR was then hailed to stop and was boarded. It was an armed boarding and occurred at approximately noon April 17 at a location approximately 150 miles from the coast of Washington.

Upon boarding, the boarding officer, Lieutenant Commander Walter John, asked appellant Rubies to see the ship's papers. Rubies had identified himself as captain. He produced a stack of papers. One document was a provisional registration certificate from the British government which expired by its own terms on June 22, 1977, unless the owner of the vessel perfected permanent registration. Permanent registration had not been perfected. Other papers indicated the HELENA STAR may have once been known under the name "FRATERNITE." In fact many of the papers had been altered by handwriting the name "HELENA STAR" after the name "FRATERNITE" had been crossed out.

Rubies indicated the provisional British registry was the only registration paper on board and further indicated that the vessel did not have a log or a cargo manifest.

After an examination of the papers presented, Commander John was still not satisfied as to the true identity of the HELENA STAR and therefore asked to be shown the main beam number. The main beam number is recognized by many, if not all, maritime nations as positive identification of a vessel. Rubies first responded that the ship did not have a main beam number and then stated that his crew was unwilling to open the securely fastened hatch covers leading to the main hold. After repeated requests, Commander John directed his own crew to begin opening the hatch covers which Rubies had indicated was the only route into the main hold. About fifteen minutes later, an easily opened alternative route was discovered.

Shortly after entering the hold through the alternative route, the marijuana was discovered. Commander Morgan was informed of the discovery and directed that the crew be placed under arrest and the vessel seized. This was done. Commander John read Rubies the *Miranda* warning and directed that he translate the warning into Spanish for his crew. This was also done.

Various items suggesting the crew of the HELENA STAR had been in contact with the United States were found on board. For example, items of food products and packages of apparent American origin, including a carton of Olympia beer, were found. Additionally, a note written in Spanish upon a Panamanian Holiday Inn stationery was found in Rubies cabin. This note had a drawing of a high-masted sailing ship with the words "azul jolly" written below the drawing. The note also contained radio frequencies, estimates of travel time, and instructions for off-loading the marijuana. The note is important because "azul" translates into "blue" and one of the other indicted co-conspirators (not before this court at this time) owned a blue 61 foot sailing sloop named "JOLI." This co-conspirator also owned some secluded waterfront property along the northwestern coast of Washington. There was other evidence of connections with the United States, but reciting them here would be unnecessary for purposes of this opinion.

Finally, after the crew was arrested and all but Rubies transferred to the YOCONA, the HELENA STAR was escorted to Seattle and there turned over to other authorities.

## AUTHORITY TO BOARD, SEARCH AND SEIZE

█ The HELENA STAR was an unidentified vessel. She flew no flag and her claimed country of registration and port of destination were both false. For all intents and purposes, she was a vessel without a country.

In such circumstances, the United States Coast Guard had not only the right but the duty to determine her true identity by whatever reasonable means necessary. Even though no British flag was shown, when the HELENA STAR claimed British registry the YOCONA did not then deny this claim and board her, but rather allowed her the right of free navigation accorded all foreign flag ships. The radical change of course, coupled with the flight through the night without lights in violation of the rules of maritime navigation and the lack of British registry, combined to give the Coast Guard ample cause to board the HELENA STAR to determine her true identity and recent activities.

The United States Coast Guard is empowered, among other things, to search and seize any vessel on the high seas that is subject to the jurisdiction of the United States. 14 U.S.C. § 89(a).[1] This statute has been held to be constitutional. *United States v. Warren*, 578 F.2d 1058, 1064 (5th Cir. 1978). The HELENA STAR was subject to the jurisdiction of the United States.

█ Under international law, foreign flag vessels are generally accorded the right of undisturbed navigation on the high seas.[2] This right is often embodied in treaties.[3] It

1. 14 U.S.C. § 89(a) provides:

 (a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

2. Under international law, the waters off the coast of a sovereign are generally divided into three categories: territorial sea, contiguous customs enforcement zone, and the high seas.

 Generally speaking, the territorial sea extends three miles seaward and it is in this area that the coastal state exercises virtually plenary control subject to the recognized requirement that the passage of foreign flag vessels may not be interfered with unreasonably. Extending for yet another nine miles is the area commonly referred to as the contiguous customs enforcement zone. The power of the coastal state over this area is generally limited to specific interests such as the enforcement of the customs and safety laws as well as other concerns agreed upon by treaty. The territorial sea together with the contiguous customs enforcement zone comprise what is commonly referred to as the "12-mile limit."

 The high seas lie seaward of the territorial sea and therefore include the contiguous zone. Each nation is generally responsible for policing its own vessels on the high seas and no state may subject the high seas to its exclusive sovereignty.

 For more discussion of the various zones and the rights and liabilities of vessels in these areas, *see generally*, Carmichael, *At Sea with the Fourth Amendment*, 32 Miami L.Rev. 51 (1977); *United States v. Postal*, 589 F.2d 862, 868–70 (5th Cir. 1979); *United States v. Warren*, 578 F.2d 1058, 1064 n. 4 (5th Cir. 1978).

3. Appellants argue the actions of the Coast Guard violated provisions of two treaties to which the United States is a party: Convention on the High Seas, *opened for signature* April

is the duty of the flag nation to control its vessels. If another nation should wish to board a foreign flag vessel, the other nation would generally seek authorization to do so from the nation whose flag the vessel flies. A foreign flag vessel is thereby protected by her country of registration. See *United States v. Postal*, 589 F.2d 862 (5th Cir. 1979). An unregistered or "stateless" vessel, however, does not have these rights and protections. The Fifth Circuit noted in the case of *United States v. Cortes*, 588 F.2d 106 (5th Cir. 1979):

> "As stated in I. Oppenheim, International Law 546 (7th ed. 1948):
>
> > In the interest of order on the open sea, a vessel not sailing under the maritime flag of a State enjoys no protection whatever, for the freedom of navigation on the open sea is freedom for such vessels only as sail under the flag of a State.
>
> Thus in *Molvan v. Attorney General for Palestine*, 1948, A.C. 351, 369, the Privy Council stated that with regard to stateless vessels '[n]o question of comity nor of any breach of international law can arise, if there is no State under whose flag the vessel sails.' *See also* I. Brownlie, Principles of Public International Law 212, 222 (1966); H. Myers, The Nationality of Ships 309–323 (1967). To secure the protection accorded foreign merchant vessels on the high seas, a vessel must accept the duties imposed by registration."

*Id.* at 110.

In *Cortes* the Fifth Circuit held that a stateless vessel is "subject to the jurisdiction . . . of the United States" as those terms are used in § 89(a), *supra*, at least for the limited purpose of determining her true identity. We agree.[4]

■ This case is analogous to *Cortes*. Nothing said or done by the HELENA STAR prior to boarding did anything to confirm her true identity. In fact, her actions only increased reasonable suspicions that something was awry. Likewise, nothing presented after boarding established any current registration. As noted earlier, many of the documents had been obviously altered, first by handwriting the name "MONICA STAR I" and later the name "HELENA STAR" after crossing out the name "FRATERNITE." With no satisfactory or even reasonable proof of her true identity, the limited search for a main beam number was entirely lawful. Once the marijuana was discovered in plain view, the seizure of the vessel was required. As stated in *United States v. Postal, supra* :

> "A concomitant to the prerogative to board is the authority, indeed the duty, to act upon suspicions aroused during the boarding . . . [if] during the course of such an inspection, circumstances arise that generate probable cause to believe that a violation of United States law has occurred, the Coast Guard may conduct searches, seize evidence, and make arrests."

*Id.* at 889.

### FOURTH AMENDMENT CONSIDERATIONS

Appellants also argue that even if the Coast Guard had the statutory power to take the actions taken with respect to the HELENA STAR, it nevertheless violated the Fourth Amendment in so doing. We disagree.

29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200 (entered into force Sept. 30, 1962); and the Convention on the Territorial Sea and Contiguous Zone, *opened for signature* April 29, 1958, 15 U.S.T. 1606, T.I.A.S. No. 5639 (entered into force Sept. 10, 1964).

However, as discussed in the text of this opinion *infra*, because the HELENA STAR was an unregistered vessel neither she nor her crew could claim any protection that might be provided by these treaties.

4. We have rested our opinion on the apparent and actual statelessness of the HELENA STAR and the consequent power of the United States Coast Guard to ascertain her true identity. We need not decide whether she was also a vessel "subject . . . to the operation of any law, of the United States" per § 89(a) because she was engaged in smuggling contraband. *See United States v. Cadena*, 585 F.2d 1252, 1259 (1978), *mod. on rehearing*, 588 F.2d 100 (5th Cir. 1979).

 Assuming but not deciding whether the Fourth Amendment applies,[5] the Amendment only prohibits searches and seizures which are unreasonable. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1921). The Coast Guard had the necessary cause to board and every action taken with respect to the boarding and subsequent search and seizure was entirely reasonable.

No search warrant was required. Even if we fail to consider the difficulty in obtaining a warrant to search a vessel that is beyond the territorial waters of the United States, *see* Fed.R.Crim.P. 41(a),[6] there nevertheless was sufficient cause to believe the HELENA STAR was stateless and the attempted flight through the night without running lights created the necessary exigent circumstances. The oceans are vast and a vessel can often easily avoid initial detection or escape afterwards.[7]

 We wish to underscore, however, that this opinion does not decide what limits, if any, the Fourth Amendment puts on the Coast Guard's authority to board vessels for the inspection of registration sailing documents and for the compliance with safety regulations. Here, there were reasonable grounds to justify boarding the vessel for a certificate and identification check. *See United States v. Cortes*, 588 F.2d 106, 110–11 (5th Cir. 1979). While no more than this is required, it may be that less of a showing by the Government would suffice in other circumstances.

The recent case of *United States v. Gallina and Piner*, 608 F.2d 358 (9th Cir. Sept. 5, 1979), is distinguishable. In that case there was no probable cause to suppose a violation, and selection of the vessel for boarding was within the sole discretion of the arresting officer.

## MIRANDA WARNINGS

 Appellants contend they were under custodial arrest from the moment of boarding and therefore were entitled to *Miranda* warnings at that time. Consequently, they argue all questioning prior to the warnings was unlawful and all statements made after the *Miranda* warnings were also suppressable as the "fruits of the poisonous tree." These arguments are without merit.

The *Miranda* warnings were given when required. They were required when appellants were placed under custodial arrest and this occurred at the time the arrest was formally announced subsequent to discovering the marijuana.[8]

## ADMISSIBILITY OF HOTEL RECEIPTS

 Appellants argue the trial court erred in refusing to admit two hotel receipts. Appellants argue the receipts would tend to prove the destination for the marijuana was Canada and not the United States. The argument is unpersuasive.

Both receipts indicated that certain co-conspirators had stayed in the respective hotels on two dates both of which were subsequent to the boarding and seizure of the HELENA STAR. The receipts were simply not sufficiently probative of the destination to warrant admission. Further-

---

**5.** The Fifth Circuit has noted that "[o]nce aliens become subject to liability under United States law, they also have the right to benefit from its protection." *United States v. Cortes*, 588 F.2d 106, 110 (5th Cir. 1979). *In accord, United States v. Odneal*, 565 F.2d 598 (9th Cir. 1977).

**6.** The Fifth Circuit recognized the difficulty in obtaining a warrant to search beyond the territorial waters of the United States. *See United States v. Cadena, mod. on rehearing*, 588 F.2d 100, 101 n. 1 (5th Cir. 1979).

**7.** While a warrant was not needed in this case, we are not unmindful of the constitutional pref-

erence that searches be made pursuant to warrants issued by detached and neutral magistrates. *See United States v. Cadena, mod. on rehearing*, 588 F.2d 100 (5th Cir. 1979).

**8.** The determination of when a custodial arrest exists rests entirely on the facts of each case. The government, of course, can not avoid the *Miranda* requirement simply by not formally arresting a person. Here, no improper action was taken by the government. *See United States v. Warren*, 578 F.2d 1058, 1071 (5th Cir. 1978) for some factors courts often use to determine the custodial nature of a detention.

more, to the extent they were probative they were cumulative of other evidence in the record. The trial court did not err in refusing their admission. *See Federal Rule of Evidence* 403.

## SUFFICIENCY OF THE EVIDENCE

Finally, appellants argue (1) actual knowledge that the marijuana was to be imported into the United States instead of somewhere else was a necessary element of their convictions for conspiracy and attempt; and (2) that the evidence was not sufficient to support the jury verdicts beyond a reasonable doubt that appellants possessed the required knowledge. The evidence was sufficient.

 Assuming actual knowledge of the true destination was an essential element,[9] there was sufficient evidence of it. When a question of sufficiency of the evidence is presented, the proper test on appeal is to

"view the evidence in the light most favorable to the Government. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The verdict of the jury will be upheld if there was relevant evidence from which the jury could reasonably have found the defendant guilty beyond a reasonable doubt. *See United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977)."

*United States v. Friedman*, 593 F.2d 109 (9th Cir. 1979).

Viewing the evidence in this light we find there was ample evidence to support the jury verdicts. The HELENA STAR was originally on a course suggesting a United States or Canadian destination; appellants were Captain and First Mate of the HELE-

NA STAR and therefore knowledgable of its true destination; many items of obvious American origin were found on board the HELENA STAR; both appellants had American currency in their possession at the time of their arrest, but did not have any Canadian currency; and finally, there was evidence of the United States based co-conspirators.

For the reasons given above, the convictions of both Rubies and Vera are affirmed.[10]

---

9. Since we have held the evidence to have been sufficient, we need not finally decide whether actual knowledge of the true destination is a required element for the convictions. But see *United States v. Conroy*, 589 F.2d 1258 (5th Cir. 1979) where it was stated:

"Conspiracy to import a controlled substance into the United States requires proof of an agreement to commit every element of that substantive offense. Just as a defendant cannot be convicted of such a conspiracy without knowledge that the substance he

was carrying was controlled . . . or without knowledge that he was transporting some substance . . . so the government must meet the burden of showing that the conspiracy to import was directed at the United States. . . ."
*Id.* at 1270.

10. The brief of appellants' co-conspirators, David A. Victorson and Eric A. Hale, was read to the extent it appeared helpful to decide the issues raised by this appeal.