# United States Court of Appeals
## For the First Circuit

No. 15-2377

UNITED STATES OF AMERICA,

Appellee,

v.

JOHVANNY AYBAR-ULLOA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Torruella, Lynch, and Barron,
Circuit Judges.

Heather Clark, with whom Clark Law Office was on brief, for appellant.

Margaret Upshaw, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and John A. Mathews II, Assistant United States Attorney, were on brief, for appellee.

January 9, 2019

**BARRON**, <u>Circuit Judge</u>.  Johvanny Aybar-Ulloa ("Aybar") pleaded guilty in 2015 to two counts of drug trafficking in international waters while aboard a "stateless" vessel in violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501-08.  He now challenges those convictions on the ground that Congress lacks the authority under Article I, Section 8, Clause 10 of the United States Constitution to criminalize his conduct, given that he contends that the conduct for which he was convicted lacks any nexus to the United States.  Aybar separately challenges the sentence that he received for those convictions.  For the reasons that follow, we affirm the convictions but vacate the sentence.

## I.

At the change of plea hearing, the government described, and Aybar does not dispute, the following events as having occurred on August 9, 2013.  HMS <u>Lancaster</u>, a foreign warship, was on patrol in the Caribbean Sea and launched a helicopter that spotted a small vessel dead in the water.  The vessel was located in international waters at the time and contained "numerous packages."

HMS <u>Lancaster</u> launched a small boat in order to conduct a right-of-visit approach.  During this approach, Aybar and his co-defendant, who were aboard the vessel with the packages, claimed to be citizens of the Dominican Republic, although the vessel bore "no indicia of nationality."

- 2 -

Law enforcement personnel aboard the small boat conducting the approach then determined that the vessel was "without nationality," as Aybar conceded to the District Court was true, and boarded it.[1] The men on board the vessel, including Aybar, were transferred to HMS Lancaster along with the packages that were taken from the vessel.

A narcotics field test performed on board HMS Lancaster confirmed that the packages contained cocaine. At this point, Aybar was transferred to a United States Coast Guard vessel and transported to Puerto Rico, where he was held in custody by United States law enforcement.

On August 13, 2013, a federal grand jury in the District of Puerto Rico returned an indictment against Aybar. The indictment charged him under the MDLEA with conspiring to possess with intent to distribute cocaine on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. § 70506(b) (count one), and aiding and abetting possession with intent to distribute cocaine on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70502(c)(1)(A), 70503(a)(1), 70504(b)(1), 70506(a), and 18

---

[1] The government represented in a filing in the District Court that the law enforcement personnel were United States Coast Guard members who were embarked on HMS Lancaster. However, the government did not mention this allegation while describing the factual basis for the convictions at the change of plea hearing.

- 3 -

U.S.C. § 2 (count two).  A forfeiture allegation, under 46 U.S.C. § 70507, was also made against Aybar.

The MDLEA provides in part:  "While on board a covered vessel, an individual may not knowingly or intentionally . . . manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance . . . ."  46 U.S.C. § 70503(a)(1).  A "covered vessel" includes "a vessel subject to the jurisdiction of the United States."  Id. § 70503(e)(1).  A "vessel subject to the jurisdiction of the United States" is in turn defined to include "a vessel without nationality."  Id. § 70502(c)(1)(A).  And, as we mentioned, Aybar conceded below that he was on board a vessel "without nationality" at the time he was apprehended.

On October 2, 2014, Aybar filed a motion to dismiss the indictment for lack of jurisdiction.  He argued that Congress lacked the power to criminalize his conduct, given the lack of what Aybar claimed to be any constitutionally sufficient nexus between his charged conduct and the United States, because Congress's power under Article I of the Constitution "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations," U.S. Const. art. I, § 8, cl. 10, did not extend to his conduct in such circumstances.

The government opposed Aybar's motion.  The District Court denied Aybar's motion on December 22, 2014 and issued a nunc

- 4 -

pro tunc opinion and order on January 5, 2015.  The District Court acknowledged that the vessel was not a "vessel of the United States" within the meaning of the MDLEA, 46 U.S.C. § 70503(e)(1); that Aybar was not a citizen of the United States; and that the other members of the crew were not either.  But, the District Court reasoned, because "international law allows the United States 'to treat stateless vessels as if they were its own,'" it followed that "persons navigating the high seas aboard a vessel without nationality have effectively waived their rights to object to the exercise of jurisdiction over them by the United States."  The District Court therefore concluded that Aybar's "as-applied constitutional challenge fails" because his vessel was stateless.

Following a change of plea hearing, Aybar entered a guilty plea to all charges on March 11, 2015.  At that hearing, Aybar engaged in the following colloquy with the Magistrate Judge:

> The Magistrate:  Now, do you admit that in addition to the conspiracy you actually and the other co-defendants possessed with the intent to distribute these substances, this cocaine?
>
> Aybar:  Yes, Your Honor.
>
> The Magistrate:  In the same circumstances on board this vessel without nationality and therefore subject to jurisdiction of the United States?
>
> Aybar: Yes, Your Honor.

- 5 -

The District Court accepted Aybar's guilty plea, and the case proceeded to sentencing. A probation officer prepared a presentence report ("PSR") using the 2014 United States Sentencing Guidelines Manual. The PSR assigned Aybar a base offense level of thirty-eight under the United States Sentencing Guidelines. After receiving the PSR, Aybar filed an objection in which he argued that two levels should be subtracted from his offense level under § 3B1.2(b) of the Guidelines because he was a minor participant.

At sentencing, the District Court declined to reduce his offense level as Aybar had argued and sentenced Aybar to 135 months in prison. Aybar timely filed a notice appealing the judgment entered against him.

## II.

In prior cases in our circuit that have presented constitutional challenges to MDLEA convictions not unlike the one that Aybar now makes to us, the defendant had either waived or forfeited the constitutional argument challenging the scope of Congress's power under Article I to criminalize conduct supposedly lacking a sufficient nexus to the United States. See, e.g., United States v. Diaz-Doncel, 811 F.3d 517 (1st Cir. 2016) (waived); United States v. Nueci-Peña, 711 F.3d 191 (1st Cir. 2013)

(forfeited).[2]  But that is not the case here.  Aybar timely raised below the challenge that he now makes on appeal.  And while Aybar did plead guilty to the offenses that underlie the convictions that he challenges on appeal, the government concedes that, in consequence of the Supreme Court's holding in Class v. United States, 138 S. Ct. 798 (2018), Aybar's guilty plea does not bar him from challenging Congress's constitutional power to criminalize his conduct pursuant to its Article I powers.

The government does separately argue that Aybar waived his right to bring this challenge because he conceded in the plea colloquy that the vessel he was on board was "without nationality" -- which is one of the MDLEA's definitions for a "vessel subject to the jurisdiction of the United States."  46 U.S.C. § 70502(c)(1)(A).  But, as we read the record, Aybar conceded only that his conduct fell within the MDLEA's scope and not that the MDLEA was a valid exercise of Congress's constitutional power under Article I insofar as it covered his conduct.

---

[2]  We rejected a similar as-applied challenge to the constitutionality of the MDLEA under the Define and Punish Clause on plain error review in Nueci-Peña.  See 711 F.3d at 196-98.  In doing so, we noted that of all the circuits to have addressed the argument that this Clause "does not authorize Congress to enact the MDLEA, which punishes conduct without a connection to the United States," at least one has squarely rejected that argument, and none has held otherwise.  Id. at 198 (citing United States v. Estupinan, 453 F.3d 1336, 1338-39 (11th Cir. 2006)).

Thus, we review de novo the district court's rejection of Aybar's constitutional challenge to Congress's power to criminalize the conduct for which he was convicted. See United States v. Bravo, 489 F.3d 1, 6 (1st Cir. 2007). Nevertheless, as we will explain, the particular constitutional challenge to Congress's power that Aybar develops fails because, although we have not had occasion directly to address it before, related precedent from our circuit precludes us from accepting the premise concerning international law on which his constitutional challenge to congressional power rests.

## A.

Aybar contends that Congress exceeded its authority under Article I in criminalizing his conduct under the MDLEA because Congress lacked the necessary power to criminalize such conduct under the Define and Punish Clause. That Clause gives Congress the power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. In responding to Aybar's constitutional challenge, the government does not identify any other source of constitutional authority pursuant to which Congress may criminalize Aybar's conduct. We thus focus here solely on the dispute between the parties regarding the scope of the power that the Define and Punish Clause affords Congress to criminalize Aybar's conduct.

- 8 -

Aybar's constitutional challenge relies heavily on Judge Torruella's dissent in United States v. Cardales-Luna, 632 F.3d 731 (1st Cir. 2011).[3]  Aybar first contends, by quoting Judge Torruella's dissent, that "piracy" under international law is only "robbery when committed upon the sea" and thus does not encompass drug trafficking.  Id. at 745 (Torruella, J., dissenting).  For that reason, he contends that Congress has no power to criminalize his conduct pursuant to the "Piracies" component of the Clause in question.

Aybar further contends, again by quoting the following portion of Judge Torruella's Cardales-Luna dissent, that the "'Law of Nations' is generally understood to be the eighteenth and nineteenth-century term for 'customary international law'" and that customary international law does not recognize drug trafficking as an offense against the law of nations.  Id. at 745-47.  Thus, Aybar contends, the "law of nations" component of the Clause at issue also does not give Congress the power to criminalize the conduct for which he was convicted.

---

[3]  The defendant in Cardales-Luna did not raise a constitutional challenge to Congress's power under Article I to regulate conduct aboard stateless vessels on the high seas absent any nexus between that conduct and the United States.  632 F.3d at 737.  Judge Torruella nevertheless addressed this issue in his dissent because he concluded that this constitutional challenge implicated the court's subject matter jurisdiction.  Id.  The majority disagreed, however, and thus declined to address the issue sua sponte.  Id.

Of course, Aybar recognizes that, even if these arguments are right, he still must show that Congress could not criminalize his conduct pursuant to its power to define and punish "Felonies" committed on the high seas. He acknowledges, as precedent compels him to do, that this portion of the Clause gives Congress an independent source of power to define and punish conduct on the high seas, separate and apart from the power that Congress has under the other portions of the Clause that we have just discussed. See United States v. Smith, 18 U.S. 153, 158-59 (1820).

In arguing that the portion of the Clause that empowers Congress to punish "Felonies" on the high seas does not permit Congress to criminalize his conduct, Aybar contends that Congress cannot define and punish his conduct as a "Felon[y]" within the meaning of Article I, Section 8, Clause 10, because there was no nexus between that conduct and the United States.[4] And Aybar bases that argument entirely on an assertion about the way that international law -- which he appears to treat as having been

---

[4] Specifically, Aybar asserts the following: He was "interdicted in a vessel in international waters"; "no offense occurred within the territorial jurisdiction of the United States"; his vessel neither departed from nor was bound for the United States; "there is no evidence that the cocaine aboard the vessel was intended for distribution" in the United States; he "did not commit any offense against a vessel of the United States"; and he was "located by and taken in custody aboard" a foreign warship.

invariant in the relevant respect from the Founding to the present -- treats drug trafficking and a nation's power to prosecute it in circumstances like those involved here.

We note that, in advancing this argument about the content of international law, Aybar is less than clear in explaining the precise extent to which, in his view, international law reflects limits on national power that the Constitution incorporates in the portion of Article I that empowers Congress to define and punish "Felonies" committed on the high seas. But, be that as it may, it is at least clear that Aybar's constitutional contention with respect to the scope of Congress's power under this part of Article I is necessarily premised on the underlying assertion that he makes about the content of international law as it relates to a nation's ability to criminalize conduct on the high seas where there is no more connection between that conduct and the United States than there is here. And so we now turn to a consideration of that international-law-based premise for his constitutional argument concerning Congress's power, for, unless we accept that premise, his constitutional challenge must fail.[5]

---

[5] We note that the Supreme Court addressed Congress's constitutional power to define and punish piracies and felonies in a series of cases in the early nineteenth century. See United States v. Furlong, 18 U.S. (5 Wheat.) 184, 195-98 (1820); Smith, 18 U.S. (5 Wheat.) at 158-60; United States v. Palmer, 16 U.S. (3 Wheat.) 610, 630 (1818); cf. United States v. Holmes, 18 U.S. (5 Wheat.) 412 (1820); United States v. Klintock, 18 U.S. (5 Wheat.)

In asserting this premise, Aybar again relies heavily on the reasoning set forth in portions of Judge Torruella's dissent in Cardales-Luna. Aybar begins by quoting Judge Torruella's conclusion that, "under the international law doctrine of universal jurisdiction (UJ), a nation may prosecute certain serious offenses even though they have no nexus to its territory or its nationals, and no impact on its territory or its citizens." Cardales-Luna, 632 F.3d at 740. But, Aybar goes on to contend, once again by quoting Judge Torruella's dissent in Cardales-Luna, that "[o]ther than in the case of those limited crimes, there is no general authority to regulate purely foreign criminal conduct that does not have a demonstrable connection with the United States." Id. at 741. Aybar then ties up his constitutional argument by asserting (yet again by quoting Judge Torruella's dissent in Cardales-Luna) that, because "[d]rug trafficking is not recognized in customary international law as a universally cognizable offense," id. at 745, the MDLEA may not afford universal jurisdiction for drug trafficking as a "Felon[y]" within the meaning of Article I, Section 8, Clause 10 of the Constitution in a case in which the defendant's conduct did not have any more nexus to the United States than was present here.

---

144 (1820). But, Aybar makes no argument that these cases resolved his constitutional argument in his favor.

The problem for Aybar in advancing this argument is that, notwithstanding his contention that international law does not authorize the United States to prosecute conduct like his own due to what he claims to be the lack of any nexus between that conduct and the United States, we set forth a contrary view of international law in United States v. Victoria, 876 F.2d 1009 (1st Cir. 1989) (Breyer, J.). There, we considered a challenge to a conviction for possessing marijuana under a predecessor statute to the MDLEA based on conduct aboard a stateless vessel that was captured off the coast of Colombia. Id. at 1009-10. And, in the course of rejecting that defendant's challenge to his drug conviction, we explained first that "international law . . . gives the United States . . . authority to treat stateless vessels as if they were its own." Id. at 1010 (second omission in original) (quoting United States v. Smith, 680 F.2d 255, 258 (1st Cir. 1982)). Then, on the basis of that understanding of international law's treatment of stateless vessels, we concluded: "Thus the United States, as a matter of international law, may prosecute drug offenders on stateless ships found on the high seas." Id.[6]

---

[6] At oral argument, when asked why our holding in Victoria was not dispositive, Aybar's counsel responded that Victoria did not address the distinction between statelessness under the MDLEA and statelessness for the purposes of international law. But, while Aybar's brief asserts in a footnote that the MDLEA's definition of statelessness is broader than international law's, he does not develop any argument for distinguishing Victoria on

- 13 -

To be sure, Victoria did not fully spell out why its conclusion that international law authorizes the United States to treat a stateless vessel as its own means that, as a matter of international law, the United States could prosecute a person on board such a vessel for a drug offense. Victoria nevertheless made it clear that its ruling was definitive as to this point through its approving and extensive references to out-of-circuit precedents holding similarly and "explain[ing] in detail why this is so." Id. at 1011 (citing United States v. Alvarez-Mena, 765 F.2d 1259, 1265-66 (5th Cir. 1985); United States v. Pinto-Mejia, 720 F.2d 248, 260-61 (2d Cir. 1983); United States v. Marino-Garcia, 679 F.2d 1373, 1382-83 (11th Cir. 1982); United States v. Rubies, 612 F.2d 397, 402-03 (9th Cir. 1979); United States v. Cortes, 588 F.2d 106, 110 (5th Cir. 1979)).[7]

---

this basis. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[7] For this reason, we do not find significant the fact, not mentioned by the defendant here, that there was some evidence in Victoria -- as there is not here -- that the vessel in that case was potentially bound for the United States. See 876 F.2d at 1010. In fact, there is no indication in Victoria that the statute at issue made proof of such a tie between the defendant's conduct and the United States necessary to convict the defendant. Nor did we qualify our holding that "the United States, as a matter of international law, may prosecute drug offenders on stateless ships found on the high seas" in light of that evidence. Id. We also note that Victoria, in asserting the United States' broad authority under international law to prosecute persons who are not citizens of the United States for drug trafficking on a stateless vessel in international waters, made no reference to our decision the year before in United States v. Robinson, 843 F.2d 1, 3-4 (1st Cir.

- 14 -

We do recognize that Victoria did not consider a constitutional challenge to Congress's power under Article I, such as Aybar now makes to us. In Victoria, the defendant argued merely that the statute there at issue did not reach his conduct in light of the Charming Betsy canon, see Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804) (reasoning that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"), given that he claimed that "international law would not permit the United States to convict him for possessing marijuana . . . so far from the United States." Victoria, 876 F.2d at 1010. But, even though our ruling in Victoria did not purport to address the constitutional question of congressional power that Aybar now raises, its reasoning is no less dispositive as to the assertion about international law that supplies the premise for the constitutional argument that Aybar does make. Accordingly, because Aybar's constitutional challenge rests on an assertion about the content of international law that, as a panel, we are not free to accept in light of our prior precedent, we must reject his constitutional contention regarding

---

1988), in which we observed in dicta that there was a "forceful" argument to be made that international law would not justify the United States' prosecution of drug offenders on a foreign-flagged ship found on the high seas where there was no clear proof that the ship was bound for the United States and where the United States acted without the flag state's consent.

- 15 -

the scope of Congress's power.  See United States v. Wurie, 867

F.3d 28, 34 (1st Cir. 2017) (explaining the law of the circuit

rule).  And, on that basis, we affirm his convictions.[8]

---

[8] The dissent disputes the merits of Victoria's holding as to international law, as well as the necessity of Victoria having resolved the Charming Betsy issue on the basis of that understanding of international law.  See Diss. Op. 30-33.  But, under the law of the circuit doctrine, what matters is simply whether Victoria did rely on that proposition for its holding that the Charming Betsy canon did not require a narrower construction of the MDLEA, and it is clear that Victoria did.  In fact, in defending that view of international law, Victoria cited extensively to out-of-circuit precedent and included parentheticals in which those circuits set forth that very proposition of international law.  See Victoria, 876 F.2d at 1011. We thus are not free to treat that aspect of the Victoria decision as mere dicta.  We note, too, that other circuits, since Victoria, have continued to rule the same way.  See, e.g., United States v. Campbell, 743 F.3d 802, 809-12 (11th Cir. 2014); United States v. Caicedo, 47 F.3d 370, 372-73 (9th Cir. 1995); United States v. Martinez-Hidalgo, 993 F.2d 1052, 1056-57 (3d Cir. 1993).

The dissent also observes that Smith, 680 F.2d 255, a decision that predates Victoria, indicates that Victoria's view of international law is mistaken.  See Diss. Op. 31-32.  The dissent further notes that Victoria relied on Smith.  See id.  However, as the dissent itself points out, Victoria did not cite the full passage from Smith that the dissent contends is at odds with Victoria's assertion about international law.  See Victoria, 876 F.2d at 1010.  And, the particular part of that passage from Smith that Victoria did cite does not support the dissent's view.  Nor does the dissent contend that it does.  See Diss. Op. 31-32.  In any event, we do not read even the full passage from Smith to support the dissent's view of it.  See Diss. Op. 31.  In that passage, Smith concludes that "[the United States] has the authority to treat stateless vessels as if they were its own," 680 F.2d at 258, and then follows that conclusion by emphasizing the circumstances of the case in front of it, stating that the United States "has [that] authority . . ., particularly when engaged in conduct affecting United States vessels and having an effect within the jurisdiction of the United States," id. (emphasis added). Read as a whole, therefore, the passage from Smith on which the dissent places much weight suggests that evidence of a nexus between the

There is, in addition to Victoria, another of our precedents that is at odds with Aybar's contention that international law of its own force requires there to be more of a nexus between a person charged with drug trafficking and the nation that wishes to criminally prosecute it than is present here. That precedent is United States v. Cardales, 168 F.3d 548 (1st Cir. 1999), which concerned the application of the MDLEA to drug smugglers on the high seas (there, on a foreign-flagged ship). Id. at 551-52.

In Cardales, the defendants argued that the Due Process Clause, rather than the Define and Punish Clause, "requires the government to prove a nexus between their criminal conduct and the United States in a prosecution for violating the MDLEA," 168 F.3d at 552, which is an argument that we rejected there, id. at 553, and that Aybar does not press here.[9] Moreover, Cardales, unlike Aybar's case, involved a foreign-flagged vessel, id. at 552, and we noted that the flag nation had consented to the assertion of

_____

conduct at issue and the United States is not necessary in order for the United States to exercise the authority that Smith recognizes.

[9] We note that Aybar's brief mentions that the warship that intercepted the stateless vessel on which he was aboard was a foreign one. That was not the case in either Victoria or Cardales (a point Aybar does not himself point out), but Aybar makes no argument as to why this difference should matter with respect to whether the exercise of United States jurisdiction over his conduct aboard the stateless vessel was consistent with international law. See Zannino, 895 F.2d at 17.

- 17 -

jurisdiction by the United States, id., which we identified as key to our holding rejecting Cardales's due process challenge on ground of a lack of any nexus.

But, apart from that aspect of our ruling, we also stated in Cardales that the application of the MDLEA in that case was consistent with the "protective principle" of international law, which permits a nation "to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security." Id. at 553 (quoting Robinson, 843 F.2d at 3). And, in so concluding, Cardales relied on a congressional finding in the MDLEA that "trafficking in controlled substances aboard vessels is a serious international problem and is universally condemned[, and] . . . presents a specific threat to the security . . . of the United States." Id. (alteration and omissions in original) (quoting 46 U.S.C. app. § 1902). Cardales then explained that "application of the MDLEA to the defendants is consistent with the protective principle of international law because Congress has determined that all drug trafficking aboard vessels threatens our nation's security." Id. (emphasis added).

There is no indication in this aspect of Cardales's reasoning that its broad assertion regarding the United States' entitlement to assert protective jurisdiction, under international law, was limited only to cases in which the flag nation has consented to the United States' assertion of jurisdiction over a

- 18 -

vessel and those on board it. See id. at 553. Thus, the language on this point in Cardales is, like the language referenced in Victoria concerning international law that we have described above, directly contrary to Aybar's sole constitutional contention, given the assertion about international law on which his contention rests.

Moreover, Aybar makes no argument as to why, notwithstanding our conclusion to the contrary in Cardales, his conduct does not fall within the United States' protective jurisdiction. He instead contends only that his crime of drug trafficking is outside the United States' universal jurisdiction. He thus develops no argument for reconsidering our statement in Cardales concluding that the scope of protective jurisdiction encompasses conduct of the kind present here. See Zannino, 895 F.2d at 17.

## III.

Aybar next argues that the District Court erroneously denied him a minor participant reduction under § 3B1.2(b) of the Sentencing Guidelines based on five factors that he contends show that he was a minor participant. That guideline provides that "[i]f the defendant was a minor participant in any criminal activity, decrease by 2 levels." U.S. Sentencing Guidelines Manual § 3B1.2(b) (2014).

Application Note 3(C) of the November 2015 edition of the Sentencing Guidelines sets forth the five factors on which Aybar relies in challenging his sentence. U.S. Sentencing Guidelines Manual § 3B1.2, cmt. n.3(C) (2015). But, as the government points out, he was sentenced according to the November 2014 edition of the Guidelines in effect at the time of his October 21, 2015 sentencing, and the application note to the minor-role guideline in that edition did not include those specific factors.

Nevertheless, Aybar did file a letter under Rule 28(j) calling our attention to our ruling in the companion case to this one, United States v. Sarmiento-Palacios, 885 F.3d 1, 6 (1st Cir. 2018), which we decided after all briefing was complete in this case. See Fed. R. App. P. 28(j). Sarmiento held that Amendment 794 to the Sentencing Guidelines, which added the five factors to the application note, clarifies the Commission's original intent regarding § 3B1.2 and therefore that it does apply retroactively. Id. And, in Sarmiento we therefore vacated the sentence and remanded for resentencing, so that the District Court could have an opportunity to apply the new factors. Id.

The government argues that vacating the sentence and remanding for resentencing is not appropriate here, because, even under the factors set out in Amendment 794, Aybar would still have been denied the minor-role reduction. But the same argument was

- 20 -

unsuccessful in <u>Sarmiento</u>, and we reject it for the same reasons that we did there:

> we think it prudent to leave that determination in the hands of the able district court judge. Accordingly, a remand is justified to allow the sentencing court the opportunity to consider the "Commission's current policy position[,] . . . [which] may have some influence on the judge's ultimate discretionary choice of sentence."

<u>Id.</u> (alterations and omission in original) (quoting <u>United States v. Ahrendt</u>, 560 F.3d 69, 79 (1st Cir. 2009)).

### IV.

We therefore **<u>affirm</u>** the convictions.  But we **<u>vacate</u>** the District Court's sentence and **<u>remand</u>** for resentencing under the Commission's clarified guidance, as reflected in Amendment 794.

**- Separate Opinion Follows -**

**TORRUELLA**, <u>**Circuit Judge, joining in part and dissenting**</u>

<u>**in part.**</u>  I join the majority with respect to Aybar's sentencing appeal in light of our recent decision in <u>Sarmiento-Palacios</u>, 885 F.3d at 6.  I respectfully dissent, however, from the majority's conclusion that our precedent requires us to affirm Aybar's conviction.  As the majority notes, none of this Court's precedent directly considered a constitutional challenge to Congress's power to criminalize conduct pursuant to Article I, section 8, clause 10.  Therefore, that precedent should not bind this panel. Moreover, the related but non-binding precedent upon which the majority relies diverges from international and constitutional law principles governing Congress' powers to criminalize the conduct in Aybar's case.  These principles, as explained below, lead to the conclusion that the application of the MDLEA to Aybar was unconstitutional.

The majority correctly identifies that Aybar's conviction hinges on the provision of the Define and Punish clause which gives Congress the authority to define and punish "Felonies" on the high seas.  <u>See</u> <u>Smith</u>, 18 U.S. at 159; U.S. Const. art. I, § 8, cl. 10.  But as explained below, the majority's reliance and application of this court's precedent to the issues in Aybar's case is inapt.

The majority opinion relies to a great degree upon the rationale in <u>Cardales</u>, 168 F.3d at 553.  <u>See</u> Maj. Op. 17-19.  But,

- 22 -

as the majority in this case concedes, the facts and issues before the court in Cardales were quite different than those in the present case. The holding in Cardales relied only on the flag nation's consent in concluding that no nexus was required under the Due Process Clause. 168 F.3d at 553 ("[D]ue process does not require the government to prove a nexus between a defendant's criminal conduct and the United States in a prosecution under the MDLEA when the flag nation has consented to the application of United States law to the defendants. . . . We therefore hold that when individuals engage in drug trafficking aboard a vessel, due process is satisfied when the foreign nation in which the vessel is registered authorizes the application of United States law to the persons on board the vessel."(emphasis added)).[10] That holding is inapplicable to the case at hand, in which there is no such consent, and the majority's reliance on it is therefore erroneous. The Cardales defendants did not raise a challenge to Congress's constitutional authority to enact the MDLEA as applied to them, and, by arguing that due process required proof of a nexus between their conduct and the United States, see id. at 552-53, inherently accepted that the enacting authority had the constitutional power to create the law under which those due process rights arise. Not so in our case.

---

[10] Consent, after all, is the cornerstone of international law. See generally The Paquete Habana, 175 U.S. 677 (1900).

Notably, the Cardales court discussed international law principles in dicta for the sole purpose of explaining why that court's application of the MDLEA to the facts in that case did not violate the precepts of due process. In its superfluous discussion of international law's protective principle, the Cardales court looked to a presumptuous Congressional statement that "trafficking in controlled substances aboard vessels is a serious international problem and . . . presents a specific threat to the security . . . of the United States." Id. (second alteration in original) (quoting 46 U.S.C. app. § 1902). The Cardales court leaned on this Congressional statement for support that "application of the MDLEA is consistent with the protective principle of international law." Id. (citing United States v. Martinez-Hidalgo, 993 F.2d 1052, 1056 (3d Cir. 1993)). The majority here leans almost as heavily on this statement. But, the accompanying parenthetical in Cardales, in expressing that the application of the MDLEA to drug trafficking on the high seas is not "fundamentally unfair," id. (quoting Martinez-Hidalgo, 993 F.2d at 1056), makes clear that the Cardales court's dicta regarding international law was used only to support its due process analysis. While the logic of Cardales may be persuasive to some, that case's conclusion is not binding to the as-applied constitutional challenge that Aybar raises here.

I pause for a moment to note that the Congressional statement relied upon by the Cardales court does not make an

application of the MDLEA to entirely foreign nationals and foreign conduct, with no nexus to the United States, consistent with the "protective principle" of international law. The protective principle of international law requires a showing that the regulated conduct has some nexus or effect on the prosecuting nation; the protective principle cannot be invoked simply through a blanket assertion that some disfavored conduct creates a "specific threat to the security" of that nation. Id. (quoting 46 U.S.C. app. § 1902). As I discussed in my dissent in United States v. Angulo-Hernández, some sort of actual cognizable threat to the nation is required under international law for an assertion of the protective principle. 576 F.3d 59, 61 (1st Cir. 2009) (Torruella, J., dissenting).

A broad grant of power to the executive branch to prosecute any and all vessels carrying illegal substances that are not in the United States' waters, are not headed for or departing from the United States, are not flying the United States' flag, and are not carrying United States nationals, is plainly inconsistent with international law. Id. (citing Restatement (Third) of U.S. Foreign Relations Law § 402 cmt. f). Allowing a nation to make such a broad assertion under the guise of the protective principle with no substantial showing of a nexus to that nation would render the protective principle coterminous with the doctrine of universal jurisdiction. Id. And, while there may

be a global consensus about the negative effects of drug trafficking, it is not a universal crime -- despite vigorous attempts by the United States at international law forums to make it one[11] -- and cannot be prosecuted under the "universality principle" of international law.

Having established that our precedent does not compel us to reject Aybar's as-applied constitutional challenge, I next address the constitutional limitations of Congress' ability to regulate Felonies on the high seas under the mandates of constitutional and international law. I am emphatically of the view that doing so requires us to hold that Congress' power under this clause is necessarily limited to instances where there is a nexus between the conduct underlying the felony and the United States. See Cardales-Luna, 632 F.3d at 739 (Torruella, J., dissenting); Angulo-Hernández, 576 F.3d at 62 (Torruella, J., dissenting); cf. United States v. James-Robinson, 515 F. Supp. 1340, 1346 (S.D. Fla. 1981) (holding that the court did not have subject matter jurisdiction because the defendant's conduct had no "effect whatsoever" on the U.S.); United States v. Angola, 514 F.

_____

[11] See United States v. Bellaizac-Hurtado 700 F.3d 1245, 1256 (11th Cir. 2012) ("The negotiators of the Rome Statute repeatedly referred to drug crimes as 'treaty crimes' only . . . [a]nd several delegates expressed the opinion that drug crimes had no place in a statute dealing with international crimes and should be addressed at the national level." (internal quotation marks and citation omitted)); see also Cardales-Luna, 632 F.3d at 745 (Torruella, J., dissenting).

- 26 -

Supp. 933, 936 (S.D. Fla. 1981) (asserting that jurisdiction was valid under the protective principle because the ship was close enough to the U.S. to assume a "real, not an imaginary, potential for harm" to U.S. narcotics laws).  Because Congress cannot grant the government the authority to prosecute conduct beyond that which the Define and Punish clause allows Congress to regulate, see United States v. Furlong, 18 U.S. (5 Wheat) 184, 196-97 (1820), and the Define and Punish clause does not give Congress the ability to regulate Felonies on the high seas having no nexus to the United States, Congress cannot create laws -- such as the MDLEA -- granting the government the authority to prosecute conduct by foreign individuals on the high seas that has no nexus to the United States.  See Eugene Kontorovich, Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction over Drug Crimes, 93 Minn. L. Rev. 1191, 1212 (2009).  "[S]uch general jurisdiction over high seas offenses had never been suggested . . . [nor] intended," and if the Constitution did not explicitly forbid Congress from legislating against foreign conduct, it was "only because it was too silly for the Framers to have contemplated."  Id. (citing Hon. John Marshall, Speech Delivered in the House of Representatives, in 4 The Papers of John Marshall, 92-93, 96, 102 (Charles T. Cullen & Leslie Tobias eds., 1984)); cf. Furlong, 18 U.S. at 196-97.  Just as Congress cannot create criminal laws regulating the conduct of foreign nationals

in foreign countries with no effect on the United States, see United States v. Nippon Paper Industries Co., Ltd., 109 F.3d 1, 4-9 (1st Cir. 1997); Restatement (Third) of U.S. Foreign Relations Law § 402(1)(c), Congress cannot create laws regulating the conduct of foreign nationals on foreign vessels over which the United States has no jurisdiction because those vessels are navigating on international waters, and there is no indication that they have either left from the United States or are headed thereto.

Early Supreme Court cases support the requirement of such a nexus. When first faced with the opportunity to determine the scope of Congress's ability to legislate extraterritorially, the Supreme Court held that, aside from universal jurisdiction crimes (that is, certain serious offenses recognized by international law that all nations may prosecute even without a nexus or impact to that nation's territory or citizens), there must be a nexus between the United States and the regulated conduct. See United States v. Klintock, 18 U.S. (5 Wheat) 144, 151-52 (1820). This principle has been continually upheld, see United States v. Pizzarusso, 388 F.2d 8, 10 (2d Cir. 1968) ("Acts done outside a jurisdiction, but intended to produce . . . detrimental effects within it, justify a state in punishing the cause of the harm." (emphasis added) (quoting Strassheim v. Daily, 221 U.S. 280, 285 (1911) (Holmes, J.))); see also United States v.

- 28 -

Columba-Colella, 604 F.2d 356, 358 (5th Cir. 1979) ("When an allegedly criminal act is performed by an alien on foreign soil[,] courts in the United States have long held that if jurisdiction is to be extended over that act, it must be supported by either the Protective or Objective territorial theory."), including in cases involving early interpretations of anti-drug trafficking laws similar to the MDLEA in situations involving stateless vessels. See e.g., United States v. Smith, 680 F.2d 255, 257-258 (1st Cir. 1982); James-Robinson, 515 F. Supp. at 1346-1347; Angola, 514 F. Supp. at 935.

Here, Aybar was interdicted on a vessel in international waters, far from the United States. His vessel did not depart from the United States nor was there any evidence that it was bound for the United States. No concrete evidence suggests that the drugs aboard this specific vessel were intended for distribution in the United States. Aybar did not commit any offense against a vessel or citizen of the United States, or within the United States' territory. Save for the fact that he was intercepted by officers of the United States Coast Guard, who in fact were aboard a foreign vessel, there is absolutely nothing connecting Aybar to the United States. The United States nexus was artificially provided by the actions of the United States, a unique condition unheard of in the criminal law -- in which it is the government that provides one of the elements of the crime that is charged.

- 29 -

Given this lack of nexus, the Felonies provision of the Define and Punish clause does not give Congress the authority to create laws criminalizing Aybar's conduct.

Because Cardales did not address the issues presented in this case, and constitutional and international law do not support the conclusion that the majority reaches, this Court need not and should not adopt the rationale in Cardales to reject Aybar's constitutional challenge. See United States v. Irizarry-Colón, 848 F.3d 61, 69 (1st Cir. 2017) (declaring that the district court was "led astray" by a prior panel's statement concerning an issue not before that prior panel); see also Cohens v. Virginia, 19 U.S. (6 Wheat) 264, 399 (1821) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."). The logical force of the Cardales dicta is insufficient to govern this Court's decision when the opposite conclusion is consistent with constitutional and international law principles.

Nor does Aybar's admission that he was aboard a vessel without nationality provide a nexus to give the United States prescriptive jurisdiction to prosecute his conduct under its domestic laws. The majority points to Victoria, in which this

Court broadly stated that "as United States courts have interpreted international law, that law gives the 'United States . . . authority to treat stateless vessels as if they were its own." 876 F.2d at 1010 (quoting <u>Smith</u>, 680 F.2d at 248).  <u>See</u> Maj. Op. 14.  But, for the following reasons, this court should not rely too heavily on that statement.

First, in <u>Victoria</u>, there was evidence of a nexus between the conduct on the stateless vessel and the United States.  876 F.2d at 1010 (noting that "the Coast Guard found . . . navigational charts indicating a course for the . . . southern tip of Florida").  Therefore, the <u>Victoria</u> court did not need to consider whether the United States could in fact treat stateless vessels as its own when there was no nexus between the conduct at issue and the United States, for the charts provided evidence of a U.S. nexus.  Second, the full quotation from <u>Smith</u>, only part of which the <u>Victoria</u> court cited,[12] itself actually supports the existence of a nexus requirement.  <u>See</u> <u>Smith</u>, 680 F.2d at 258 (stating that the United States "has authority to treat stateless vessels as if they were its own, <u>particularly when engaged in conduct affecting United</u>

_____

[12] <u>Victoria</u>, 876 F.2d at 1010 ("[A]s United States courts have interpreted international law, that law gives the 'United States . . . authority to treat stateless vessels as if they were its own.'" (second alteration in the original) (quoting <u>Smith</u>, 680 F.2d at 258)).

States vessels and having an effect within the jurisdiction of the United States" (emphasis added)).

Third, like in Cardales, the defendant in Victoria appealed his conviction on grounds not at issue here. The Victoria defendant partly based his argument on the Charming Betsy canon, in with the Supreme Court stated that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804). As the majority recognizes, the defendant in Victoria asserted that Congress did not intend for the MDLEA to apply extraterritoriality, implicit in which is acceptance of Congress' authority to enact such a law. See 876 F.2d at 1010. Unlike the Victoria defendant, Aybar asserts that Congress did not have the authority under the Define and Punish clause to apply the MDLEA to regulate extraterritorial conduct having no nexus to the United States. Furthermore, the statement from Victoria, if read to foreclose any nexus requirement other than a defendant's presence aboard a stateless vessel, would run afoul of international law (and therefore the Charming Betsy cannon), which is clear that it allows countries to prescribe law extraterritorially only when there is some connection between the conduct and that country. See Restatement (Third) of U.S. Foreign Relations Law § 402. Therefore, the majority in this case

overstates the extent to which Victoria forecloses the argument that Aybar presents.

Before moving forward, I must fall on my own sword and recognize that I, like the Victoria court and the majority here, have made too broad an assertion. See Sarmiento-Palacios, 885 F.3d at 7 (Torruella, J., concurring) ("And while the United States (like all nations) does have universal jurisdiction over stateless vessels . . . ."); Cardales-Luna, 632 F.3d at 747 ("These principles regarding [universal] jurisdiction have been relaxed to include . . . stateless vessels."). But, "it is never too late to 'surrende[r] former views to a better considered position.'" South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2100 (2018) (Thomas, J., concurring) (quoting McGrath v. Kristensen, 340 U.S. 162, 178 (1950) (Jackson, J., concurring)). And, upon further reflection, I now realize that international law's allowance of any nation to prevent the operation of stateless vessels does not confer jurisdiction on that nation to prosecute the individuals aboard those vessels under that nation's domestic criminal codes.

It is widely accepted that international law confers the right of any nation to approach and "visit" a vessel if it is suspected that the vessel is stateless. See United Nations Convention on the Law of the Sea [hereinafter "UNCLOS"] art. 110, Dec. 10, 1982, 1833 U.N.T.S. 397. But, international law distinguishes between a nation's authority to prescribe law

- 33 -

extraterritorially as to the conduct of foreign persons and its authority to interfere with the navigation of a vessel encountered on the high seas.  Although stateless vessels enjoy no diplomatic protections and thus are subject to being stopped and boarded by any other nation's vessels, it does not follow that this "right to visit" confers jurisdiction on the boarding vessel's nation to prosecute the occupants of the stateless vessel -- who continue to enjoy diplomatic protection from their nation -- under the visiting nation's substantive criminal laws without some nexus between their conduct and the boarding nation.  See James-Robinson, 515 F. Supp. at 1343 n.5 (explaining that the issue before the court was not whether the United States had jurisdiction over a stateless ship, but whether it had jurisdiction "over the foreign citizen crewmembers of such a stateless ship"); see also Ted L. McDorman, Stateless Fishing Vessels, Int'l Law, and the U.N. High Seas Fisheries Conference, 25 J. Mar. L & Com. 531, 540 (1994) (discussing the views of D. O'Connell, 2 The Int'l Law of the Sea 75 (Oxford University Press, Inc., 1984) and H. Meyers, The Nationality of Ships 318-321 (Martinus Nijhoff, 1967) (noting that individuals aboard stateless vessels "retain their nationality" and may thus be prosecuted by their home country under international law); see, e.g., Robin R. Churchill & Alan V. Lowe, The Law of the Sea 172 (1988) (arguing that a vessel's "'statelessness' will not, of itself, entitle each and every State

to assert jurisdiction over [its occupants], for there is not in every case any recognized basis, such as nationality or territoriality, upon which jurisdiction can be asserted over them while they are on the high seas . . . . [T]here is a need for some jurisdictional nexus in order that a State may extend its laws to those on board a stateless ship and enforce the laws against them").

A review of customary international law reveals that in all instances for which a state may interfere with the right of passage of another vessel, aside from the universal jurisdiction crimes of piracy and slave trading, international law requires some independent nexus between the visiting state and the suspected basis for the interference. See UNCLOS at art. 110. For example, customary international law allows a State to board a foreign vessel on the high seas if the State has reason to believe that the foreign vessel is engaged in unauthorized broadcasting.[13] Id. at art. 110(c). But that State may only prosecute those individuals engaged in that unauthorized broadcasting if that State has an independent basis for asserting jurisdiction over those individuals or that conduct. See id. at art. 109(3),

_____

[13] UNCLOS defines "unauthorized broadcasting" as "the transmission of sound radio or television broadcasts from a ship or installation on the high seas intended for reception by the general public contrary to international regulations, but excluding the transmission of distress calls." UNCLOS at art. 109(2).

110(1)(c).  Similarly, while any nation may board and prevent navigation of a suspected stateless vessel under international law, that nation must have a nexus to the vessel's occupants or to those occupant's conduct to assert jurisdiction to prosecute those aboard the stateless vessel for a violation of its domestic laws -- such as drug trafficking under the MDLEA.  The application of that nation's domestic laws to a stateless vessel's occupants without a nexus unilaterally extends that nation's sovereignty over the high seas, in violation of customary international law. See UNCLOS at art. 89.

Moreover, allowing all nations to prosecute crewmembers aboard stateless vessels under that nation's own domestic laws simply because of their presence aboard that stateless vessel would convert the operation of a stateless vessel into a universal jurisdiction crime.  "There are two premises underlying universal jurisdiction.  The first involves the gravity of the crime. . . . The second involves the locus delicti (place of the act)." Bellaizac-Hurtado, 700 F.3d at 1260 (Barkett, J., concurring) (quoting Michael P. Scharf, Application of Treaty-Based Universal Jurisdiction to Nationals of Non-Party States, 35 New Eng. L. Rev. 363, 368-69 (2001)).  But, piloting a stateless vessel is not of the same heinous nature as those universal jurisdiction crimes (piracy, slavery and genocide) and has not been recognized as a universal crime under international law.  See UNCLOS; Allyson

- 36 -

Bennett, That Sinking Feeling: Stateless Ships, Universal Jurisdiction, and the Drug Trafficking Vessel Interdiction Act, 37 Yale J. Int'l L. 433, 448-50 (2012) (explaining that universal crimes are those agreed upon by the international community to be "so heinous . . . that they offend the interest of all humanity," such as genocide, and noting that statelessness is not listed as a universal jurisdiction crime under UNCLOS). In fact, I have been unable to find any federal statute or regulation making piloting a stateless vessel a crime under the laws of the United States. Because being aboard a stateless vessel does not meet the substantive component (the gravity of the crime) of universal jurisdiction, and is not a universal crime, it follows that nations cannot apply their domestic laws to an individual simply by the fact that they are aboard a vessel without nationality.

Just as Congress cannot pass legislation "attempting to apply the criminal laws of the United States, with the Bolivian government's consent, to the conduct of Colombian nationals in Bolivia," Cardales-Luna, 632 F.3d at 741 (Torruella, J., dissenting), it cannot punish foreign nationals aboard foreign vessels. See, e.g., Furlong, 18 U.S. at 197-98; Klintock, 18 U.S. at 151. And, for the reasons explained in this dissent, the same must be true even if those foreign nationals were aboard stateless vessels. If any state can assert its own laws based purely on a vessel's statelessness, then it follows that a United States

citizen aboard a stateless vessel can be prosecuted under any foreign country's domestic laws even if the regulation of such conduct would be considered absurd in the United States. Common sense dictates that this is not and cannot be the case.

There is no denying that most circuits, including our own, have upheld the application of the MDLEA to the crews of stateless vessels. However, this Court has not yet directly addressed the exact constitutional challenge Aybar has raised, and we need not be constrained by related but non-binding precedent. And because the Felonies provision of the Define and Punish clause requires that there be a nexus between the conduct and the United States to pass constitutional muster, and no such nexus has been shown here, Aybar's conviction must be overturned. For the foregoing reasons, I respectfully dissent.